ROLAND CHILTON AND FLORENCE CHILTON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91332.   Filed June 21, 1963.

*Theodore Tannenwald, Jr.,* and *John J. White,* for the petitioners.
*Henry L. Glenn,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1954, 1955, 1956, and 1957 in the amounts of $48,873.52, $35,589.50, $2,400.96, and $717.02 respectively.

The issue for decision is whether amounts received in the years here involved by Roland Chilton pursuant to contracts with his employers constitute ordinary income as compensation or long-term capital gains from the sale or exchange of patents.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife residing in Glen Rock, N.J., filed joint Federal income tax returns for the taxable years 1954, 1955, 1956, and 1957 with the district director of internal revenue at Newark, N.J.

Roland Chilton (hereinafter referred to as petitioner) is an engineer. He was educated in England.

Prior to 1918 petitioner had been employed as an engineer successively by the Sunbeam Motor Car Co., D. Napier & Sons, J. B. Ferguson, and Crane Simplex Corp. In 1918 petitioner became employed as chief engineer by the Aeromarine Plane and Motor Co. (hereinafter referred to as Aeromarine). He remained employed by this company until September 1929, when he became employed by Wright Aeronautical Corp. Petitioner's work at Aeromarine consisted primarily of designing and supervising the construction and testing of aircraft engines. During the time petitioner was employed by Aeromarine, he made approximately 50 patentable inventions, although only a relatively small part of his time was devoted to making inventions. An important area of petitioner's inventive activities at Aeromarine was in the field of variable speed transmissions and starter devices, particularly the inertia starter. Petitioner had no specific agreement with Aeromarine in regard to his inventions. Aeromarine claimed that it owned all inventions made by petitioner by virtue of the fact that petitioner was its employee. Before petitioner's employment with Aeromarine was terminated, he had obtained an agreement from Aeromarine to pay royalties to him on the inventions and patents covering the inertia starter.

While petitioner was employed by Aeromarine, he had extensive sales contacts on behalf of that company with the Bureau of Aeronautics of the U.S. Navy Department and particularly with an employee of that bureau who subsequently became vice president of sales and service at Wright Aeronautical Corp. (hereinafter referred to as Wright). It was this officer of Wright who suggested that petitioner be employed by Wright. At that time Wright was having serious operating difficulties with one of its engines, which had failed to meet a test established by the U.S. Navy Department which had been successfully met by Aeromarine.

Early in 1928, Wright entered into negotiations looking toward the employment of petitioner. Wright had a compelling need at that time to strengthen its engineering department and the officers of Wright knew of petitioner's ability and experience as a skilled engineer and troubleshooter. The officers of Wright also knew of petitioner's reputation as an inventor. Wright was primarily interested in acquiring petitioner's services as an engineer and initially submitted to him a contract which simply provided for payment to him of an annual salary of $15,000. Because of petitioner's prior disputes with Aeromarine with respect to that company's obligation to pay royalties for his inventions, petitioner insisted upon a contract with Wright which would make special provision with respect to his

inventions. On September 3, 1929, petitioner and Wright entered into a contract which provided in part as follows:

I. The Company shall employ Chilton and Chilton shall enter the employ of the Company.

II. Chilton shall be known under the title of "Consulting Engineer".

III. The Company shall pay Chilton as compensation at the rate of Fifteen thousand dollars ($15,000.00) per year, payable in semi-monthly installments during the term of Chilton's employment.

IV. The term of Chilton's employment shall be from the date of the execution of this contract to the date of its termination as hereinafter provided.

V. The services that Chilton shall render to the Company shall consist in engineering work relating to the improvement of existing types of aircraft engines and other products of the Company or products similar to the products of the Company and to the development of new types and in allied engineering activities. Chilton shall during business hours devote his whole time and apply his experience and his inventive ability to the problems, improvements, and developments relating to the Company's products and products similar to the Company's products, referred to him by the Company.

VI. (A) Chilton shall assign to the Company the entire right, title, and interest in and to all inventions and improvements made by him during his employment by said Company relating to aircraft engines and other products manufactured by the Company or products similar thereto, and all said inventions and improvements shall belong to and be the sole and exclusive property of said Company in and for all countries of the world, and Chilton hereby acknowledges that all said inventions and improvements shall be made for and in the interest and for the account of said Company and he hereby expressly transfers and assigns all said inventions and improvements to said Company in and for all countries of the world.

(B) Chilton shall disclose promptly to the Company all inventions and improvements which he may make relating to or upon aircraft engines and other products manufactured by the Company, or products similar thereto, during the term of this contract.

VII. (A) The Company shall pay for the preparation, filing, and prosecution of all applications for Letters Patent which the Company desires to be filed in its behalf on the inventions or improvements of Chilton.

(B) Chilton shall do all acts and things and execute and deliver all application papers, assignments, and other instruments in writing that may be necessary to secure to and vest in the Company the entire right, title, and interest in and to said inventions and improvements, in and to all applications for Letters Patent covering said inventions and improvements, and in and to all Letters Patent of the United States and of all other countries that may be granted for said inventions and improvements.

VIII. Chilton shall furnish the Company, with such assistance as the Company can give him, complete copies of detailed working drawings covering all inventions and improvements and shall furnish the Company with such information as he may have available with respect to the construction of any products covered by said inventions and improvements.

IX. The Company shall have 90 days after completion of a development test on any invention or improvement to determine whether or not it will accept any such invention or improvement offered to it by Chilton, and unless within said 90 days the Company gives Chilton written notice that it accepts said invention or improvements, Chilton shall be at liberty to file applications on his own behalf and at his own expense on any of such inventions which have not so been accepted by the Company.

X. Chilton shall have and retain full rights in and shall be free to file in his own behalf applications for patents on any and all of his inventions not directly relating to aircraft engines or other products of the Company or products similar thereto, and, in addition thereto, Chilton shall have and retain full rights in and to any and all inventions in or directly relating to engine starting devices and shall be at liberty to file in his own behalf applications for patents on said inventions.

XI. As additional compensation, the Company shall pay Chilton:

(a) Two and one-half percent (2½%) royalty on the published list price, * * *

\* \* \* \* \* \* \*

XII. The employment of Chilton by the Company may be terminated by either of the parties hereto upon thirty (30) days' notice in writing each to the other, such notice to be by registered mail, addressed to the last known address of the party who receives such notice. Upon the termination of the employment by such written notice, the payment of the compensation herein provided shall terminate. The Company, however, shall continue to make the payments to Chilton in accordance with subdivisions (a) and (b) of paragraph XI hereof, said payments to continue with respect to each invention or improvement during the life of the Letters Patent granted thereon.

XIII. The Company shall keep complete books of account and records respecting the manufacture and sale of all devices, components, assemblies, or parts hereunder and shall give Chilton or his duly authorized representative the privilege of inspecting or examining the Company's books in his behalf at all reasonable times, not to exceed four such inspections or examinations per year.

\* \* \* \* \* \* \*

XV. Chilton shall assist the Company to prosecute infringers of any of the Letters Patent included within this agreement and also to defend any action instituted against the Company by reason of its manufacture, sale, and/or use of any products in accordance with the provisions of this contract; if as the result of the decision of a court of last resort in any suit brought on a patent assigned by Chilton to the Company, or by the decision of an inferior court from whose decree no appeal is taken within the time provided by law, such patent is declared either invalid or an infringement, or for any reason whatsoever, then the payments by the Company to Chilton with respect to such patent shall cease and terminate and there shall be no further liability on the part of the Company to Chilton thereunder.

XVI. This agreement shall be binding upon the heirs and assigns of Chilton and upon the successors and assigns of the Company.

The contract between petitioner and Wright was terminated on December 31, 1934, at which time petitioner was employed by Reed Propeller Co., Inc. (hereinafter referred to as Reed). Reed and Wright were both subsidiaries of Curtiss-Wright Corp. (hereinafter referred to as Curtiss-Wright). The contract dated December 31, 1934, between petitioner and Reed, insofar as here pertinent, contained provisions identical to those of petitioner's contract of September 3, 1929, with Wright. On December 31, 1934, Wright assigned to Reed all its right, title, and interest in the patents and patent applications in which it had an interest. Petitioner remained employed by Reed under this contract until June 30, 1938, when his employment was terminated, and he simultaneously entered the employ of Wright under a contract dated June 30, 1938, which insofar as here pertinent,

contained substantially the same provisions as the September 3, 1929, contract between petitioner and Wright except that paragraph 6(a) thereof provided only:

6.(a) CHILTON shall assign to WRIGHT the entire right, title and interest in and to all inventions and improvements made by him during his employment by WRIGHT directly relating to aircraft engines and/or their accessories, and all said inventions and improvements shall belong to and be the sole and exclusive property of WRIGHT in and for all countries of the world.

Reed on June 30, 1938, assigned to Wright all the right, title, and interest it had in patents and patent applications. At no time was petitioner represented by counsel in connection with the preparation or execution of the 1929, 1934, or 1938 contracts.

The 1938 contract between petitioner and Wright was amended several times, primarily to provide for limitation of the amount of royalties which petitioner might be entitled to receive in view of the greatly increased demand for Wright's products caused by war conditions during the period 1941 to 1945. On October 12, 1949, Wright notified petitioner that his employment under the agreement dated June 30, 1938, would terminate on November 15, 1949. Petitioner has not been an employee of Wright, Reed, or Curtiss-Wright since November 15, 1949.

During the period from September 3, 1929, through November 15, 1949, whenever petitioner developed an invention covered by his contract with Wright or Reed, he offered such invention to his employing company. In each instance the company notified petitioner in writing whether or not it was interested in acquiring the invention. Whenever the company indicated its desire to acquire an invention, a formal application for patent and an assignment by petitioner to the company were prepared by the employer's attorneys and executed by petitioner. If petitioner's employing company did not indicate a desire to acquire the invention, no instrument of transfer from petitioner to Wright or Reed was executed.

During petitioner's association with Wright he devoted the major portion of his time to the diagnosis of problems involving the functioning and development of Wright's products in a manner not designed to and in fact not resulting in patentable inventions. Among his duties were giving advice and counsel to layout men, supervising test operations, analyzing and screening inventions submitted by outside inventors, traveling for inspection and other business purposes, serving as a member on Wright's engineering council, handling problems with the U.S. Government, and preparation of service reports. A relatively minor portion of petitioner's time at Wright was spent in inventing. However, petitioner did obtain 91 patents which were assigned to Wright, Reed, or Curtiss-Wright pursuant to these contracts. During this same period petitioner applied for and obtained

27 patents which were not assigned to Wright, Reed, or Curtiss-Wright.

Wright and Reed did not use all the patents assigned to them by petitioner in their manufacture of aircraft engines and accessories.

Subsequent to 1949 the Wright Aeronautical Division of Curtiss-Wright assumed the obligations of Reed and Wright under the contracts of these companies with petitioner. During the taxable years 1954 through 1957 Curtiss-Wright paid to petitioner the following amounts with respect to the patents indicated:

| | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|
| Patent No. 2,040,833; application filed 12/27/34; patent issued 5/19/36. Friction-drive variable-speed transmission. | | | | |
| Patent No. 2,061,896; application filed 6/5/35; patent issued 11/24/36. Friction-drive variable-speed transmission. | | | | |
| Patent No. 2,289,285; application filed 12/28/38; patent issued 7/7/42. Improvements on Nos. 2,040,833 and 2,061,896 with concentric torque-meter for reduction gears registering turning effort of engine. Royalties received on above three patents considered as one__ | $5,601.00 | $4,596.00 | $4,359.00 | $4,560.00 |
| Patent No. 2,112,984; application filed 2/21/35; patent issued 4/5/38. Dynamic damper (pendulum counterweight) to eliminate crankshaft torsional vibrations. Royalties received_____ | 137,042.41 | 45,549.46 | 3,814.33 | 323.33 |
| Patent No. 2,158,272; application filed 2/10/37; patent issued 5/16/39. Side-thrust rocker arm pad to eliminate twisting loads on rocker arm bearings. Royalties received_____ | ---------- | --------- | 96.00 | --------- |
| Patent No. 2,144,607; application filed 7/16/37; patent issued 1/24/39. Reduction gear with even distribution of load along teeth to prevent misaligning deflection. Royalties received_____ | 26,208.00 | 21,140.00 | 5,502.00 | --------- |
| Totals _____ | 168,851.41 | 71,285.46 | 13,771.33 | 4,883.33 |

Included in the payments to petitioner in 1954 is the amount of $34,090.57 for which Curtiss-Wright mailed its check to petitioner in the latter part of December 1954. Petitioner did not receive this check until January 4, 1955.

The inventions which were the subject matter of patents Nos. 2,112,984, 2,158,272, and 2,144,607 were made during the period of petitioner's employment by Reed under the contract dated December 31, 1934, and the invention which was the subject matter of patent No. 2,289,285 was made by petitioner during his employment by Wright under the contract dated June 30, 1938. The inventions which were the subject matter of patents Nos. 2,040,833 and 2,061,896 did not come within the scope of petitioner's contract with Wright dated September 3, 1929, or petitioner's contract with Reed dated December 31, 1934. Wright was granted the exclusive right and license to manufacture, use, or sell throughout the world the inventions covered by these patents in accordance with an agreement between petitioner, Wright, and Allan Chilton entered into on March 16, 1942. Patent No. 2,289,285 was an adaptation of patents Nos. 2,040,833 and 2,061,896. Application for patent No. 2,289,285 was made by petitioner pursuant to his contract with Wright dated June 30, 1938.

During the period that petitioner was associated with Wright or Reed he conducted extensive design and patent activities away from the premises of these corporations and outside his regular employment hours. The office and drafting facilities used by petitioner in his independent research were maintained at his own expense and he paid the compensation of his associates and assistants for the work they performed for him. As a result of this work away from Wright's or Reed's premises petitioner developed a number of patents or inventions, some of which were sold to parties other than Wright or Reed, and some to Wright outside of the contract between petitioner and Wright.

Petitioner at no time owned any stock in Wright and never had more than a nominal interest in any corporation affiliated with Wright.

Wright, on its books and income tax returns, treated the $15,000 a year paid to petitioner from September 3, 1929, through November 15, 1949, as a salary payment, and the remaining payments to petitioner as royalty payments. No deduction was made from the amounts treated as royalty payments for income tax or social security tax and such payments were not included in the base for determination of petitioner's pension rights. During the period of World War II, the Salary Stabilization Unit of the Bureau of Internal Revenue issued a ruling to Wright that the amount paid to petitioner which it designated as royalties did not constitute salary within the meaning of the applicable salary stabilization regulations.

At the time of petitioner's original employment by Wright in 1929, Wright's treasurer and chief engineer received less salary than peti-

tioner, and its factory manager, the same salary as petitioner. This situation generally prevailed until around 1941 when Wright made a general salary adjustment and most of its employees' salaries were increased, the salary of the vice president and general manager going up to $60,000 a year. There was no increase in petitioner's salary (except for a small increase for a period of about a year) from 1929 until the termination of his employment with Wright on November 15, 1949.

Other employees of Wright who made inventions were required to assign such inventions to the company for only a nominal considera-tion. Most of these employees received salary increases during the period in which petitioner received no such increase.

Petitioner usually received 5-percent royalty on inventions he assigned to parties other than Wright as compared to the 2½ percent on inventions assigned to Wright.

On petitioner's income tax returns for the years 1939 to 1953, he reported the payments received from Wright, Reed, or Curtiss-Wright in respect of the inventions made during his employment by Wright and Reed as ordinary income from a business or profession. On his income tax returns for the years 1954, 1955, 1956, and 1957 he reported the payments received from Curtiss-Wright in respect to such inventions as capital gains.

Respondent, in his notice of deficiency, determined that the payments received by petitioner from Curtiss-Wright during the years 1954, 1955, 1956, and 1957, pursuant to his contracts with Reed and Wright, constituted ordinary income and gave the following explanation in each of these years:

The grounds for this determination are: (1) the amount constitutes compensation for personal services; (2) you have failed to establish that said amount qualifies for treatment as long-term capital gain.

OPINION

Section 1235 of the Internal Revenue Code of 1954 [1] provides that a transfer of property consisting of all substantial rights to a patent

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated. Section 1235 provides as follows:

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

\*     \*     \*     \*     \*     \*     \*

(c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

by the person whose efforts produced such patent shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are contingent on the productivity, use, or disposition of the property transferred and regardless of the taxable year in which such transfer occurred. The amounts received by petitioner during the years here involved were with respect to patents produced by his efforts. Therefore, under section 1235 these amounts are capital gains from the sale or exchange of a capital asset if at any time petitioner made a transfer of all substantial rights to these patents.

It is respondent's position that petitioner never made a transfer of all substantial rights to any of the patents with respect to which the payments during the years in issue were received. Respondent takes the position that petitioner never owned any substantial rights in such patents and therefore his assignment of the patents to Wright or Reed did not transfer to those companies any substantial rights. Respondent contends that under petitioner's contracts with Wright and Reed those companies owned the inventions which petitioner made at all times from the discovery leading to the inventions. In support of his position, respondent relies primarily upon his regulations [2] which provide that payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the right to any invention by such employee are not attributable to a transfer to which section 1235 applies, and the case of *Arthur N. Blum*, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950).

Petitioner contends that under the facts here present, he was not employed to invent so as to make his inventions the property of Wright or Reed. Petitioner distinguishes the *Blum* case on the basis of the differences in the facts in that case and the instant case. He also contends that the controlling law is different in the instant case since no provisions similar to section 1235 were applicable to the years involved in the *Blum* case.

It is clear from the contracts between petitioner and Reed and Wright that petitioner was obligated to disclose to Wright and Reed

---

[2] Income Tax Regs., sec. 1.1235–1 (c) (2). *Payments to an employee.* Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all the facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other requirements under section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent.

all inventions or improvements which he made relating to aircraft engines and their accessories. If within 90 days after completion of development tests, Wright or Reed notified petitioner in writing that it accepted the invention, petitioner was obligated by his contract to execute and deliver all application papers, assignments, and other writings necessary to secure to Reed or Wright the entire right, title, and interest in and to the inventions relating to aircraft engines and their accessories and all letters patent that might be granted for such inventions, developments, or improvements.

Respondent argues that these provisions of the contract made Wright or Reed the equitable owners of any inventions with respect to aircraft engines and their accessories made by petitioner. Respondent states that had petitioner refused to assign any rights in any inventions which he made or applications for patents or patents on such inventions to Wright or Reed, these companies could have obtained such an assignment by an action in equity for specific performance. Petitioner does not contend that Wright and Reed could not under the contracts have enforced specific performance of his agreement to transfer to them his inventions and patents. Petitioner argues that this right created by the contracts did not, itself, constitute the transfer of the patents and that when the transfer occurred the companies acquired "all substantial rights" to the patents. Petitioner relies on a number of cases involving executory contracts to assign patents including *Carl G. Dreyman*, 11 T.C. 153, 161 (1948); *Briggs* v. *Hofferbert*, 85 F. Supp. 941 (D. Md. 1949), affd. 178 F. 2d 743 (C.A. 4, 1949); and *Becker* v. *United States*, 161 F. Supp. 333 (W.D. Pa. 1958). The facts in each of these cases differ from those in the instant case but in each case a sale was held to have been made at the time of the assignment of the patent even though prior to such assignment a contract to assign had been executed.

Petitioner further points out that even if an executory contract to assign an invention is construed as transferring all rights to such invention immediately upon the conception of the invention, section 1235 makes the transfer of the invention at that time the sale of a capital asset held for more than 6 months. Cf. *F. H. Philbrick*, 27 T.C. 346 (1956). Respondent's regulations do not state that all payments to an employee who is required to assign his inventions to his employer are compensation for services. These regulations refer to compensation for services rendered "as an employee."

We agree with petitioner that his agreement with Wright and Reed to assign to them the rights to his inventions, standing alone, would not cause section 1235 to be inapplicable to the payments received by him in the years here in issue pursuant to these contracts.

The real question in issue here is whether petitioner was "hired to invent" aircraft engines and accessories or assigned the duties of devoting himself to such specific inventions. If a person is employed by another "to invent" a specific product or specific products, the fruits of the employee's labor, the invention, belongs to his employer. *United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178 (1933); and *Marshall* v. *Colgate-Palmolive-Peet Co.*, 175 F. 2d 215 (C.A. 3, 1949).

The payment to the employee is for his labor, not for the product, "the invention."[3] The payment is therefore compensation for services and taxable as such. *Arthur N. Blum, supra*, and *Karrar* v. *United States*, 152 F. Supp. 66 (Ct. Cl. 1957).

The nature of the relationship between petitioner and his employers must be determined from the contracts between them and the conduct of the parties. Cf. *Blum* v. *Commissioner*, 183 F. 2d 281 (C.A. 3, 1950), affirming 11 T.C. 101. If the provisions of the contract were unambiguous, it might be unnecessary to consider other facts. However, these provisions are not clear as to the nature of petitioner's employment.[4] Petitioner agreed to apply his "inventive ability" to his employers' products. However, preceding the sentence referring to petitioner's "inventive ability" is a sentence classifying petitioner's services as "engineering work." There is a similar inconsistency between the reference in the contracts to all petitioner's aircraft engine inventions being the property of Wright or Reed and the provision that if written notice were not given to petitioner within 90 days

---

[3] In *United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178, 187, the Court stated:

One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. *Standard Parts Co.* v. *Peck*, 264 U.S. 52. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. *Hapgood* v. *Hewitt*, 119 U.S. 226; *Dalzell* v. *Dueber Watch Case Mfg. Co.*, 149 U.S. 315. * * *

[4] There was probably no reason for such clarity prior to Nov. 15, 1949, when petitioner left Wright's employ. The necessity arises now because of an amendment to the income tax laws. Certainly, a case with the facts here involved would not have turned on the question of compensation, except for the provisions of sec. 1235, 1954 Code, and sec. 117(q), I.R.C. 1939, which is substantially similar to sec. 1235, 1954 Code, and applicable to the years governed by the 1939 Code beginning after May 31, 1950. The facts are completely clear that petitioner was in the business of inventing. The underlying purpose of sec. 1235 was to make it clear that the granting of an exclusive license to make, use, and sell an invention was a sale or exchange and not a license. See *Leonard Coplan*, 28 T.C. 1189, 1191, with respect to the history of the enactment of sec. 117(q), I.R.C. 1939. However, the section also removed the distinction between a person in the business of inventing and an amateur and removed the requirement of the 6-month holding period for capital gains. *F. H. Philbrick*, 27 T.C. 346 (1956).

after the completion of development tests, all rights to the inventions shall belong to petitioner.

Turning to the other evidence, we think it clear that petitioner was not "hired to invent" aircraft engines, improvements thereon, or accessories thereto. Such, in substance, was the testimony of several witnesses. The actions of the parties support this testimony. Wright at the time it hired petitioner had not proposed to have the contract make provision for his inventions. From at least 1939 petitioner on his income tax returns reported the amounts received with respect to the patents assigned to Wright or Reed as income from his business of inventing. When these returns were filed, this income was taxable as ordinary income. There existed no self-serving reason for petitioner to report the payments as income from a business or profession as distinguished from compensation for services. Reed, Wright, and Curtiss-Wright each on their books and records and Federal income tax returns, treated the payments to petitioner with respect to the patents as royalties and not as compensation. These facts and others in the record indicate that none of the parties to these contracts considered the payments with respect to the patents to be compensation to petitioner for services as an employee.

Since the payments petitioner received with respect to the patents in accordance with his contracts with his employers were not compensation for services rendered "as an employee," the amounts were payments to petitioner for transfer to his employers of his inventions and patents. This is the very type of payment which section 1235 states shall be considered as received from the sale or exchange of a capital asset. We sustain petitioner in his contention that the payments he received from Curtiss-Wright during the years here involved are taxable as gain from the sale of a capital asset held for over 6 months.

Since respondent has made certain adjustments with respect to which no issue has been raised in the petition,

*Decision will be entered under Rule 50.*