THOMAS H. McCLAIN AND MARIBETH S. McCLAIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93916.   Filed August 14, 1963.

*Howard J. Deards* and *Howard G. Rath, Jr.,* for the petitioners.
*Donald D. Winn,* for the respondent.

### OPINION

FORRESTER, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the calendar years 1957 and 1958 in the amounts of $2,913.62 and $1,756.27, respectively. Petitioners assert an overpayment of such taxes for 1958 of $999.31. The sole

issue for decision is whether certain income received from his employer by petitioner Thomas H. McClain (hereinafter referred to as McClain or petitioner) was ordinary income or capital gain.

All of the facts have been stipulated and are so found.

Petitioners are husband and wife residing in La Canada, Calif. They filed joint Federal income tax returns, computed on the cash basis, with the district director of internal revenue at Los Angeles, Calif., for the calendar years 1957 and 1958.

McClain entered the employ of Lockheed Aircraft Corp. (hereinafter referred to as Lockheed) on October 16, 1936. He was initially employed as a file clerk and blueprint sorter. In 1937 he was made a layout draftsman, a position held by him until July 1, 1941, when he was assigned to the position of junior research engineer. McClain worked as a junior research engineer until August 1942, at which time he was designated a design engineer, and he occupied that position until he was promoted to design specialist on October 16, 1961.

Except for a period of 4 months in 1954 when he was on a temporary leave of absence while president of the Lockheed Section of the Engineers and Architects Association, now known as the Engineers and Scientists Guild, McClain has been continuously employed by Lockheed since 1936. His formal education prior to employment at Lockheed included a high school diploma and 1½ years of junior college study in the field of aviation mechanics and design.

Lockheed is today and for a number of years has been a major company in the development and production of aircraft, missiles, and related equipment. The common stock of Lockheed is listed on the New York Stock Exchange. McClain has never owned, and does not now own, directly, indirectly, constructively, or otherwise, 25 percent or more of any class of the outstanding stock of Lockheed.

Early in 1938, Lockheed adopted the practice of requiring every employee, as a condition of employment, to execute an agreement in favor of Lockheed, which agreement pertained in part to possible future inventions of the employee. The agreement became known within Lockheed as the "Assignment of Inventions Agreement" (hereinafter referred to as the agreement). Initially, this agreement was placed by Lockheed on the bottom of each employee's application for employment. At the time this practice was adopted in 1938, each existing employee of Lockheed, including McClain, was required to file a new application for employment and execute the agreement which appeared on the bottom thereof as a condition of his continued employment.

McClain executed such a new application for employment on April 15, 1938. The application contained the agreement in the following form:

In event of my employment by Lockheed Aircraft Corporation, I agree fully to the following: * * * (4) In part consideration for the wages to be paid to me in the event of my employment, I hereby agree to assign to Lockheed Aircraft Corporation, its successors or appointees, all my right, title and interest in and to any inventions, improvements, and new methods of manufacture or process, together with any patents that may be issued thereon, both in the United States of America and all foreign countries, that I may invent, discover, or produce, or cause to be invented, discovered or produced in any manner whatsoever, relating to aircraft, aeronautical equipment or to machines, methods, operations or processes used in their manufacture or relating in any way to the field of aviation, whether during my regular working hours, or at the suggestion or request of my employer, or whether solely or jointly with others. I further agree to execute all documents necessary to the issuance of patents therefor, both in the United States of America and all foreign countries and to the assignment thereof to Lockheed Aircraft Corporation, its successors or appointees. The word "invention" as herein used includes "make", "discover", or "produce", or any of them; "invention" includes the phrase "any new or useful original art, machine, manufacture, process, composition of matter, design, or configuration of any kind" and the words "improvement", "discovery" or "production" or any of them; "patent" includes "letters patent" and "all the extensions, renewals, modifications, improvements and reissues of such patent" "appointee" includes "whomsoever the first party may designate". This agreement shall be effective during the entire period of my employment and for a period of six (6) months thereafter.

During the years 1940 and 1941, while employed by Lockheed, McClain conceived, invented, and perfected a new and different windshield construction (hereinafter referred to as the invention) to be used on aircraft. This involved the use of both a laminated glass windshield, the plastic filler of which extends beyond the glass on all sides, and a special type of mounting or bracket into which the glass is laid when installed on the aircraft.

The basic idea for the invention was conceived by McClain in 1940 and disclosed to Lockheed by means of drawings and a written description prepared by him. An application for patent was prepared by Lockheed's attorneys and filed by McLain under Lockheed's supervision and control in the U.S. Patent Office during 1940. This application was abandoned because McClain had not adequately described therein the type of material to be used between the windshield glass.

McClain originally conceived of polymerized vinyl butyral for use between the windshield glass. The Pittsburgh Plate Glass Co., at the request of Lockheed, prepared working models of the McClain concept, using his design and various materials, including polymerized vinyl butyral, between the glass. These models were tested by McClain to determine which material was best suited to his concept. These tests of the working models were conducted by him during 1941, using Lockheed equipment and facilities, at Lockheed's direction, and with Lockheed's approval. McClain concluded that polymerized vinyl

butyral, the type of material originally considered, was the preferred material to be employed between the layers of glass.

During the period in 1940 in which the basic idea for the McClain invention first was conceived by him, McClain was assigned by Lockheed, as a layout draftsman, to design the window installations for the cockpit section of the fuselage of the model 44 aircraft then being developed by Lockheed. In performing this assignment it was anticipated by Lockheed that McClain would use the existing state of the art (that is to say, the then-available materials and techniques).

McClain was not originally assigned by Lockheed specifically to invent a new windshield construction for the model 44 or any other aircraft. However, after he had conceived of the invention he was assigned as a junior research engineer in a structural research group at Lockheed for a relatively short time to determine which material was best suited to his concept.

The invention was determined to involve two separate patentable ideas. The two patentable ideas involved were the subject of documents entitled "Assignment" which were signed by McClain on December 31, 1941, and on June 12, 1942. The assignments read in pertinent part as follows:

ASSIGNMENT

WHEREAS, I, THOMAS H. McCLAIN, residing at Altadena, County of Los Angeles, State of California, have invented a new and useful TRANSPARENT CLOSURE AND MOUNTING for which I am about to make application for Letters Patent of the United States; and

WHEREAS, LOCKHEED AIRCRAFT CORPORATION, of Burbank, County of Los Angeles, State of California, is desirous of acquiring an interest therein:

NOW, THEREFORE, for a valuable consideration, the receipt of which is hereby acknowledged, I, THOMAS H. McCLAIN, do hereby sell, assign and transfer unto said LOCKHEED AIRCRAFT CORPORATION, its successors and assigns, the full and exclusive right for the territory of the United States of America and for all foreign countries, in and to the said invention as described in the specification executed by me on the * * * [date of execution hereof] preparatory to obtaining Letters Patent of the United States therefor; said invention, application and Letters Patent to be held and enjoyed by the said LOCKHEED AIRCRAFT CORPORATION for its own use and behoof, and for its legal representatives, to the full end of the term for which said Letters Patent may be granted, as fully and entirely as the same would have been held by me had this assignment and sale not been made.

The assignments executed by McClain in 1941 and 1942 were recorded in the U.S. Patent Office on January 3, 1942, and June 15, 1942, respectively.

The two patentable ideas comprising the invention related to aircraft and the field of aviation and were hence covered by the provisions of the agreement executed by McClain in favor of Lockheed on April 15, 1938.

With respect to each patentable idea comprising the invention, a patent application was filed by McClain, with Lockheed bearing the costs of making such application. The applications were prepared by attorneys employed by Lockheed. With respect to the first patentable idea contained in McClain's invention, patent No. 2,293,656 was issued by the U.S. Patent Office on August 18, 1942. With respect to the second patentable idea contained in McClain's invention, the U.S. Patent Office issued patent No. 2,351,991 on June 20, 1944. The invention described by the patents has also been patented in seven foreign countries.

All legal steps toward the procurement of the patents in the United States and the various foreign countries were handled either by attorneys directly employed within Lockheed or by outside counsel retained by Lockheed.

Lockheed has executed licensing agreements covering the invention with three licensees, including the Pittsburgh Plate Glass Co. and the Libbey-Owens-Ford Co., and has derived very substantial royalties from such license agreements. All negotiations with respect to these license agreements were handled by Lockheed personnel other than McClain, who took no part therein. The license agreement between Lockheed and the Libbey-Owens-Ford Co. was executed on May 25, 1942. The license agreement between Lockheed and the Pittsburgh Plate Glass Co. was executed on November 18, 1940.

In October 1942, Lockheed adopted a plan now known as the Lockheed patent plan (hereinafter referred to as the plan). The idea for this plan was originally conceived by Lockheed's patent counsel, who recommended it to the company's management. The McClain invention, which was recognized by Lockheed as a valuable invention and a contribution to the aviation industry, was a factor which caused the management of Lockheed to recognize the desirability of such a program and which influenced the decision of Lockheed's management to adopt the plan. McClain did not participate in any way in the discussions of the various Lockheed officials which ultimately culminated in the decision to adopt the plan.

The terms of the plan were first promulgated to all Lockheed employees in October 1942, in a booklet entitled "Lockheed and Vega Plan for Recognizing Constructive Employee Ideas." The plan as enumerated in that booklet provided that an employee who developed a patentable idea would receive $25 at the time the application for patent was filed and would receive a second $25 at the time the patent was issued. In addition to these initial payments, it was provided that if Lockheed granted licenses or made sales of whole or partial rights under the patent, the employee would receive 10 percent of the

money received from such licensing or sale. These latter payments were not to exceed an aggregate of $5,000, except that in unusual cases the maximum payment might be exceeded upon special consideration by the president of Lockheed.

The 1942 booklet describing the plan contained the following statement:

The company reserves the right to change or discontinue this plan at any time after published notice. Awards for proposals and patents granted but not paid preceding the change or discontinuance of this plan will not be affected.

The plan was amended by Lockheed in 1945, 1948, 1955, 1960, and 1961. New booklets describing the changes in the plan were published with each amendment. By these changes the amounts to be paid employees were increased and the $5,000 limitation was deleted.

The 1945 booklet contained a much more developed explanation of the plan than the 1942 booklet. The 1945 booklet detailed the purpose of the plan, its scope, the method of disclosing inventions to Lockheed, the investigation to be made by Lockheed of employee inventions, the method of preparation and prosecution of patent applications, the income participation by employees, and the rights reserved by Lockheed with respect to sales and licenses of patents and cancellation of the plan. It provided, *inter alia*, as follows:

PURPOSE  The purpose of the Patent Plan is to encourage employees of Lockheed in the development of new and better products and processes of manufacture in an effort to further the progress of the Company and the industry. It provides for the payment of cash awards and a percentage of royalties to employees who make patentable inventions. It is open to all company employees.

\*       \*       \*       \*       \*       \*       \*

PREPARATION AND PROSECUTION OF PATENT APPLICATION  If it is decided that the invention is of sufficient value to apply for patent, \* \* \* When the application (original, divisional and/or a continuation) is prepared, an assignment to the Company will be submitted to the inventor-employee for his signature in accordance with the Assignment of Inventions Agreement, which the employee signs upon the occasion of his original employment. Also at such time a first payment of $25.00 will be made to him.

\*       \*       \*       \*       \*       \*       \*

INCOME PARTICIPATION \* \* \* The employee-inventor will share in revenue or royalties for the life of the patent, whether or not he remains with the Company. In the event of his death before the patent expires, his designated heirs will receive the continuing awards. All deductions required by law will be made at the time the awards are paid.

\*       \*       \*       \*       \*       \*       \*

CANCELLATION  The Patent Plan may be amended or discontinued at any time by the Company, provided that any amendment or cancellation shall neither affect nor disturb any existing patent licenses then in force and the royalty payments due, or to become due thereon.

In 1948 the plan was again amended and the description of the plan was revised. The plan as amended in 1948 was substantially identical to the 1945 version, and the above-quoted language of the 1945 version of the plan remained unaltered except that (1) the payment to be made to an employee-inventor upon the issuance of a patent was increased from $25 to $50, (2) no royalty payments were to be made to employees with respect to revenue received from Lockheed subsidiaries, and (3) the percentage of royalties payable to the employee-inventor was increased.

In 1955 the plan was again amended, but the only change was to increase the payment to the employee-inventor upon execution of the assignment to $50 and to increase the payment upon issuance of a patent to $100. The percentage of royalties payable and the other provisions of the plan remained the same.

The payments to McClain here involved were made pursuant to the plan as amended in 1955.

A "Foreward" to the 1955 booklet describing the plan read as follows:

The Lockheed Aircraft Corporation is sincerely interested in providing a means to encourage its employees in the creation of novel ideas and developments. Such ideas are of vital need to our continued success and will provide mutual benefit for employer and employee during the years ahead. The Management feels that this Patent Plan has great merit and will be of particular benefit to the employee. It is hoped that this Plan will act as an incentive for all employees to do original thinking. In the past this Plan has been of benefit to both parties; it is hoped and expected that it will be of greater benefit in the years to come.

During the years 1948 to 1961, inclusive, McClain received the following salary payments from Lockheed:

| Year: | Salary | Year—Continued | Salary |
|---|---|---|---|
| 1948 | $6,435.76 | 1956 | $11,630.63 |
| 1949 | 5,996.81 | 1957 | 11,729.34 |
| 1950 | 6,461.40 | 1958 | 12,203.09 |
| 1951 | 7,158.66 | 1959 | 12,831.37 |
| 1952 | 8,609.22 | 1960 | 13,413.61 |
| 1953 | 6,633.00 | 1961 | 14,328,65 |
| 1954 | 8,369.69 | | |
| 1955 | 11,126.39 | Total | 136,927.62 |

For the calendar years 1957 and 1958, petitioners reported the salary paid to McClain in the amounts of $11,729.34 and $12,203.09, respectively, as ordinary income on their Federal income tax returns.

Through the year 1961, McClain received the following royalty payments from Lockheed pursuant to the plan, all of which were paid

out of royalties received by Lockheed pursuant to the aforementioned license agreements:

| Year: | Royalty payments | Year—Continued | Royalty payments |
|---|---|---|---|
| 1946 (+ prior) | $23,529.64 | 1955 | $7,129.43 |
| 1947 | 682.85 | 1956 | 9,133.41 |
| 1948 | 745.95 | 1957 | 16,674.35 |
| 1949 | 1,283.52 | 1958 | 11,316.55 |
| 1950 | 628.45 | 1959 | 13,657.37 |
| 1951 | 1,505.50 | 1960 | 20,953.84 |
| 1952 | 2,552.45 | 1961 | 9,880.91 |
| 1953 | 3,618.91 | | |
| 1954 | 6,149.00 | Total | 129,442.13 |

McClain received no payments pursuant to the plan in 1957 and 1958 other than those paid out of royalties received by Lockheed and mentioned above.

For the years 1942 through 1956, petitioners reported all payments made under the plan to McClain on their Federal income tax returns as ordinary income, as part of McClain's compensation from Lockheed.

On their Federal income tax returns for the taxable years 1957 and 1958, petitioners reported the amounts of $16,674.35 and $11,316.55, respectively, paid by Lockheed to McClain under the plan as capital gain. Petitioners commenced to report such payments as capital gain pursuant to the advice of their legal counsel.

From the inception of the plan in October of 1942, payments made by Lockheed to employees, including McClain, pursuant to the plan were paid by means of checks separate from checks issued for the salary paid to employees. Such payments made to employee-inventors who at the time of such payments were still employed by Lockheed were issued by the payroll department of Lockheed and carried the payroll code of "P" with the account number of the employee. Such payments made to employee-inventors who at the time of such payments were no longer employed by Lockheed were issued by the accounts payable department of Lockheed and did not carry the payroll code number.

From the inception of the plan, all withholding and employment taxes were deducted by Lockheed from the amount of all payments under the plan to employee-inventors who at the time of such payments continued to be employees of Lockheed, and all such payments were included on forms W-2 issued by Lockheed with respect to such employees.

No withholding or employment taxes were deducted by Lockheed from payments made pursuant to the plan to employee-inventors who at the time of such payments were no longer employed by Lockheed.

The amounts received by McClain from Lockheed in 1957 and 1958

pursuant to the plan were in consideration for the transfer of all substantial rights to patents.

Respondent determined that the amounts received by McClain in the years in question pursuant to the plan constituted ordinary income under section 61 of the Internal Revenue Code,[1] and he argues on brief that said amounts were in consideration of services rendered Lockheed by McClain, and therefore did not constitute consideration for the transfer of the patents.

The sole issue is whether the disputed payments are within section 1235, which provides in relevant part as follows:

SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

\*      \*      \*      \*      \*      \*      \*

(c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

The regulations provide that the question of whether payments to an employee are compensation for services, or are attributable to the transfer of patent rights, is one of fact.[2] Respondent argues that the regulation is not applicable because the transfer in this case was

---

[1] All Code references are to the Internal Revenue Code of 1954 unless otherwise noted.

[2] Sec. 1.1235–1(c)(2), Income Tax Regs.

(2) *Payments to an employee.* Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all the facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other requirements under section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent.

fully supported by the consideration of petitioner's employment. Respondent concludes that petitioner had no remaining substantial rights to transfer[3] and that consequently the disputed payments were simply additional salary.

We perceive no substantial differences between this case and *Roland Chilton*, 40 T.C. 552. The differences that do exist favor this petitioner, for Chilton was expressly hired to "render * * * engineering work relating to the improvement of existing types of aircraft engines * * * and to the development of new types * * * [and to] apply his experience and his inventive ability to the problems, improvements, and developments relating to the company's products * * *." Thus Chilton was far closer to having been hired to invent than this petitioner.

It is true that in *Roland Chilton, supra*, the employment contract provided for the royalty payments there in dispute, while here such contract is silent as to any payments over and above wages. But we regard this as a distinction without a difference. It is clear that petitioner was not hired to invent, and Lockheed, without quibble, paid him the amounts in dispute in full compliance with its successive patent plans. These amounts were not gifts, *Commissioner* v. *Duberstein*, 363 U.S. 278, and it is equally clear from the facts that they were not mere wages, but were attributable to the transfer of the patent rights and at least a part of the consideration for such transfer just as surely as the bonuses paid in *Lucas* v. *Ox Fibre Brush Co.*, 281 U.S. 115, were additional compensation for services and deductible by the corporate payor.

*Decision will be entered for the petitioner.*

---

[3] This precise point has been considered recently in *Rose Marie Reid*, 26 T.C. 622, 633 (1956) :

> We do not deem it important that petitioner transferred her interests in 1946, whereas the agreement giving rise to the payments in question was executed in 1949. Even in the absence of any dispute as to whether Californian's rights to petitioner's trade name and inventions were perfected or indefeasible, the payments in question were made in respect of the transfer of such rights. Whether they be viewed as payments for finally perfecting those rights, or additional consideration for that to which Californian was already entitled, they were in consideration of the transfer of the trade name and inventions, and not for personal services, and represent capital gains to petitioner. * * *

Also see *Hofferbert* v. *Briggs, 178* F. 2d 743, 745 (C.A. 4, 1949) :

> Even if the royalties had been mere additional payments for patent right already transferred, there is no reason why they should not be treated as gains from the sale of capital assets and not as ordinary income. Payment for the transfer of a capital asset does not suffer a change of character because made after the transfer or because made in addition to a prior consideration. There is nothing in the contract or elsewhere to support the contention that the payment of the royalties was compensation for personal services.