Karl R. Komarek and Rose Marie Komarek v. Commissioner.
Komarek v. Commissioner
Docket Nos. 445-65, 5370-65.
United States Tax Court
T.C. Memo 1967-112; 1967 Tax Ct. Memo LEXIS 147; 26 T.C.M. (CCH) 523; T.C.M. (RIA) 67112; May 19, 1967
Harold T. Berc, for the petitioners. Charles E. Lomax, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies and additions to petitioners' tax: Addition to tax
under Sec.
Year
Deficiency
6653(a) [1]
1960
$ 485.00
1961
7,020.19
$351.01
1962
6,991.25
349.56
1963
15,808.37
Because of concessions *148 by both parties (including a concession by respondent with respect to the additions to tax), only two issues remain for our consideration: (1) Was the percentage of earnings, as well as base salary, paid to petitioner Karl R. Komarek additional compensation for services or was it paid for the transfer of the rights to certain patents, thereby qualifying as capital gain under section 1235? (2) Was the Komarek Trust a qualified charitable recipient under section 170(c)(2) so that contributions to it were deductible? General Findings of Fact Some of the facts are stipulated and are found accordingly. Karl R. Komarek and Rose Marie Komarek are husband and wife and had their legal residence in Chicago, Illinois, at the time of filing the petition herein. They filed joint returns for the years in question with the district director of internal revenue, Chicago, Illinois. Rose Marie is a party to this proceeding solely by reason of having filed a joint return with Karl. Accordingly, any reference to petitioner shall be to Karl. Findings of Fact - Issue No. 1 Petitioner has been employed by Komarek-Greaves and Company (hereinafter referred to as the "Company") since 1949, serving *149 in various engineering and management capacities. The Company is engaged in the business of manufacturing briquetting equipment. Except for one qualifying share each, held by petitioner and his father, neither petitioner nor any member of his family held stock in the Company, directly or indirectly. On July 30, 1954, petitioner became president of the Company. In this capacity, petitioner has been responsible for a large part of the Company's sales and for handling land acquisition, plant expansion, purchases of machinery and raw materials, supervision of employer-employee relationships, and all conventional executive functions. From time to time, petitioner, individually or jointly, invented several improvements in the products sold by the Company. The rights to these inventions were assigned to the Company, which processed the patent applications as assignee. The Company incorporated some of petitioner's inventions into its products. The first two of the patents were applied for on September 5, 1952 and February 8, 1954, respectively. Patents were issued thereon and seven additional patents were applied for and issued, all on or after October 9, 1956. Each of the assignments *150 of inventions by petitioner to the Company stated that the transfer was "in consideration of One Dollar ($1.00) and other good and valuable consideration." Petitioner's relationship with the Company has been governed by a contract originally entered into on March 31, 1953 and renewed annually in subsequent years. The original contract provided in pertinent part: 1. That the party of the first part [the Comapny] covenants and agrees to and does hereby engage and employ the party of the second part [petitioner], for a term commencing April 1, 1953 and ending on March 31, 1954 to assist in the management and conduct of the business of the party of the first part, subject to the supervision and control of the President and Board of Directors of the party of the first part, and to perform such other duties and services for and on behalf of the party of the first part as shall from time to time be assigned to him by the said President or Board of Directors, and to pay him a salary of $7,200.00 per year, payable semi-monthly, and in addition thereto, pay him within ninety (90) days after the close of the fiscal year of the party of the first part ending on March 31, 1954, a sum equivalent *151 to three (3%) per cent of that part of the net earnings of the party of the first part made during the period of time commencing April 1, 1953 and ending March 31, 1954 which shall remain after deducting from said net earnings an amount equivalent to six (6%) per cent for said period on the par value of all shares of capital stock of the party of the first part issued and outstanding on March 31, 1954. 2. That the party of the second part covenants and agrees that he will for said period and for said consideration devote his entire time, skill, labor, attention and energy during usual business hours exclusively to the service of the first party and such part of the management and conduct of its business and the performance of such other duties and services as shall from time to time be assigned to him by the President or Board of Directors of the first party. 3. That during the term of this agreement he will not either directly or indirectly engage in or become connected with any undertaking or business of the same or a similar nature as that in which the first party is now or may during the term of this agreement be engaged. 4. That he will assign to the party of the first part *152 all his right, title and interest in any and all inventions and discoveries and applications for patents heretofore or during the life of this contract made by him or in which he may be or become interested, and will disclose all such inventions and discoveries to the party of the first part and to no other person without its consent; and will assign any and all letters patent heretofore or hereafter issued to, or otherwise acquired by him relating primarily and particularly to the making of briquets or to machinery, processes or equipment for the making, production or manufacture of briquets, or presses, pulverizers, mixers and any other machine or process in any way relating to those made or used by the party of the first part, and that he will make, execute and deliver to the party of the first part any and all instruments in writing that may be deemed proper or necessary to vest in the party of the first part all the right, title and interest of the party of the second part in all such inventions and discoveries, applications for patents and letters patent. 5. It is agreed that anything in this contract to the contrary notwithstanding, either party hereto shall have and each *153 is hereby given the right to terminate said employment at his or its will upon thirty (30) days' written notice given to the other party either personally or by deposit in the United States Mails, addressed to said party at its or his last known address; it is agreed and understood that in case of such termination, however, and by whomever made, the second party shall receive his compensation for services rendered by him, up to the date of termination, and such proportion of the amount of net earnings as he would have received for the full term of this contract as the portion of said period which shall have expired at the time of such termination of employment bears to the full term thereof, the amount of which shall be ascertained and paid to him within ninety (90) days after the expiration of the fiscal year expiring March 31, 1954; nor shall such termination release him from the part of this agreement which requires him to disclose and assign any inventions, discoveries or patents made or acquired by him to the party of the first part. 6. That for the purpose of determining the amount of compensation to be paid hereunder to the party of the second part for services rendered during *154 the period of this contract, the net earnings of the party of the first part for the fiscal year commencing April 1, 1953 and ending March 31, 1954 shall be considered to be the net earnings during said year available for distribution as dividends by the party of the first part as shown by the books kept by the party of the first part * * *. [Emphasis added.] The 1953 contract was extended annually. At the time petitioner became president of the Company, his base salary was increased to $10,000 per year. On January 1, 1957, his base salary was increased to $12,000. On April 1, 1962, the base salary was increased to $15,000. In the March 30, 1955 extension, the percentage of earnings to be paid petitioner was increased to 10 percent, commencing with the fiscal year of the Company ending March 31, 1956. In the April 20, 1956 extension, the percentage of earnings was increased to 12 percent, commencing with the fiscal year ending March 31, 1957. Except for the changes noted above, the annual extensions continued the original contract without change. Petitioner's contract with his employer resulted in the following amounts being paid to him: Base
Percentage of
Year
salary
earnings
1960
$12,000.00
$19,429.23
1961
12,000.00
30,908.51
1962
14,250.00
30,355.98
1963
15,000.00
28,976.07
*155 In 1960, 1961, and 1962, petitioner reported the entire amount of payments from the Company as ordinary income, while in 1963 he reported all payments from the Company as long-term capital gain. Respondent's deficiency notice treated all of the 1963 payments as ordinary income. Petitioner now concedes that the base salary for each year is taxable as ordinary income but contends the payments representing the percentage of the Company's earnings should be taxable as long-term capital gain. Opinion - Issue No. 1 Our task is to determine whether the percentage payments received by petitioner from the Company were additional compensation for services, as determined by respondent, or were paid for the transfer of patent rights, as petitioner contends. The issue is one of fact. Thomas H. McClain, 40 T.C. 841 (1963). Such being the case, no useful purpose would be served by a detailed examination of past decisions. We need only collectively apply the principles distilled from those decisions. At the outset, we note that respondent does not contend that petitioner was "hired to invent" and that the percentage payments were compensation for such activity. Cf. Roland Chilton, 40 T.C. 552 (1963). *156 Rather, respondent argues that the percentage payments, as well as the base salary, represented compensation for general services rendered by petitioner to the Company. Petitioner counters with a series of syllogisms. He submits that such a view of the arrangement would necessarily mean that he made a gift of the patents to the Company. On this basis, petitioner argues that some payment must have been made for the patents. He goes on to state that there are no specific provisions of the contract with the Company which require a determination that the percentage of earnings was paid for his services. Consequently, according to him, we should look to extrinsic, parol evidence as to the intent of the parties and such evidence conclusively shows that the percentage of earnings was paid for the transfer of the patent rights. We think that petitioner's analysis is misconceived. If we examine the arrangements between petitioner and the Company, certain critical indicia emerge: (1) In the original 1953 agreement, both the base salary and the percentage payments are included in the paragraph providing for the performance of services by the petitioner. None of the extensions of, or other recorded *157 action respecting, that agreement provide for any separation. That the Company twice increased the basic salary, without simultaneously dealing with the percentage payments, and vice versa, is not a meaningful indication to the contrary. (2) The percentage payments, like the base salary, were to be made irrespective of whether any inventions or patents were transferred and were to cease upon the termination of employment. In the usual situation, payments are related directly to the transfer of the patents and are to continue for the duration of the patents. In this light, we find it hard to accept the assertion that petitioner's worth to the Company for his services was only his base salary of $12,000 to $15,000 annually and that the percentage earnings of $20,000 to $30,000 annually were intended exclusively for the product of his alleged inventive genius. (3) The percentage payments were keyed to the net earnings of the Company and do not, as is generally the case, constitute royalties dependent upon the use or licensing of the inventions. To be sure, there was general testimony that each of the Company's products embodied an invention of petitioner but no attempt was made to *158 delineate the extent to which petitioner's inventions enhanced the value of the Company's products and thereby contributed to its net earnings. (4) Paragraph 6 of the original 1953 agreement, which deals with the manner in which the percentage of earnings is to be computed, specifically designates the amount of such payments as "compensation * * * for services rendered." Moreover, in several of the extensions of the original agreement and in the minutes of directors' meetings, there are various references to "the terms and conditions of your employment contract dated March 31, 1953," to "a written employment contract to Karl Richard Komarek providing for a fixed salary, together with 3% of the net earnings of the Company," to "amendments to the employment contracts with * * * Karl R. Komarek, whereby the percentage of net earnings paid * * * was changed to * * * 12%," and to the original agreement as an "employment contract." Granted that no one of the foregoing elements standing alone would be fatal to petitioner's case, we think that they make clearly inapplicable our decisions in Thomas H. McClain, supra, Roland Chilton, supra, and Franklin S. Speicher, 28 T.C. 938 (1957), *159 upon which petitioner so heavily relies. Indeed, a comparison of these cases with our decisions in Arthur C. Ruge, 26 T.C. 138 (1956), and William R. Ost, T.C. Memo. 1958-18, reflects differing results which the application of the guiding principles produces. Petitioner's assertion that some payment must be allocated to the transfer of the patents in order to avoid treating such transfers as a gift is without foundation. Obviously, the obligation of the Company to employ petitioner furnishes a more than adequate quid pro quo for his undertaking in this regard. It seems to us that the provision in the 1953 agreement relating to the transfer of patents was inserted merely to avoid any question of the Company's shop rights. Nor do we think that the presence of the standard phrase "other good and valuable consideration" in the patent assignments requires a different conclusion. We have not overlooked petitioner's testimony that the apparent terms of the written agreement were orally modified. One of petitioner's witnesses (Chapman) attempted to corroborate this testimony, but we accord his statements little, if any, weight in the absence of any evidence *160 that he was in any way involved in the negotiations, discussions, or other activities relating to the arrangements between petitioner and the Company. Under these circumstances, even if we accept the proposition that parol evidence may properly be considered under the circumstances involved herein, petitioner's obviously self-serving assertions are not determinative and must give way to the other elements which we have outlined. We have not taken into account the evidence relating to the arrangements between the Company and other employees, which respondent has emphasized, because the inferences to be drawn therefrom are tenuous at best. Included in this category is the testimony relating to the existence of a profit-sharing plan for employees in which petitioner did not participate. To the extent that petitioner draws comfort from this situation, we think his efforts are misdirected. If anything, the lack of participation by petitioner indicates that he was already being compensated for his services in this fashion through the percentage payments. The cumulative effect of the critical elements, and the other relevant facts and circumstances revealed by the record herein, inescapably *161 leads to the conclusion that the percentage payments were compensation for services and we accordingly sustain respondent on this issue. Findings of Fact - Issue No. 2 On each of his Federal tax returns for 1961 and 1962, petitioner claimed a charitable deduction of $13,500 as a contribution to the so-called Komarek Trust. On his 1963 return, petitioner claimed a similar deduction of $9,500. Respondent determined that the Komarek Trust did not qualify under section 170 and accordingly denied the deduction. The Komarek Trust was established by petitioner and his wife. The trust agreement, dated November 26, 1960, provided in pertinent part that: This Trust or Foundation shall be administered and operated exclusively for educational purposes with emphasis on engineering and scientific purposes within the United States of America. Students who are worthy and well qualified in the aforesaid fields shall be aided and assisted in the furtherance of their education as the trustees shall deem best. The said trustees are hereby empowered, as are their successor or successors or survivor, that in the event said Trust or Foundation shall at any time be held not to qualify as an organization *162 exempt from income tax liability under present or future Internal Revenue Codes, the Trustees shall have the power to alter this Trust and amend same, in any manner that will qualify said Trust or Foundation as an exempt organization under such laws. Any and all amendments shall be in writing and executed by the proper parties. * * *
The Trustees shall at once take possession of the said estate and collect all the income derived therefrom, from which they shall first pay or retain all the necessary costs and expense of this trust, including outlays necessary for the protection, management and upkeep of the trust estate, repairs, alterations, improvements, interest upon encumbrances, taxes (general, special, income, profit, inheritance and gift), insurance premiums and the expense of the care and maintenance for keeping the property in the trust estate in good condition, and the reasonable compensation of the trustees, their agents, attorneys and employees. The remainder of the income (hereinafter called "net income") shall be paid to the Settlors and/or the survivor of them during their natural lives and thereafter, during the term of this trust, such net income shall be added *163 to the assets of the trust estate, to be distributed as hereinafter provided. At such time as they may determine and within three (3) years after the death of the last Settlor, the Trustees shall dissolve this trust, or by January 1, 1975, whichever date is later, but in any event not beyond January 1, 1978. It is the intention of the Settlors hereinder to so distribute this estate to their son, RICHARD KARL KOMAREK, as far as possible, as herein set forth. Trustees shall distribute the trust estate as follows: (a) They shall first pay and discharge all the obligations of said trust, including reasonable compensation to themselves. (b) They are authorized and empowered to value and appraise all the property, real and personal, of said trust and to convert all or any part thereof into cash, if necessary, and to make distribution of the estate, in kind or in cash or partly in kind and partly in cash, as they may deem advisable, and such valuation, appraisal and distribution shall be conclusive and binding upon the beneficiaries hereunder. * * *
The Settlors, jointly, may, by a written declaration, alter, amend or revoke, in whole or in part, this trust and may, in writing, *164 withdraw from the said trust any piece or parcel of personal or real property. [Emphasis added.] The Komarek Trust was not organized exclusively for religious, charitable, scientific, literary or educational purposes. Opinion - Issue No. 2 The sole question involved is whether petitioner is entitled to deductions for charitable contributions of amounts transferred to the Komarek Trust. Section 170, inter alia, provides for the following charitable deductions: (c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - * * *
(2) A corporation, trust, or community chest, fund, or foundation - * * *
(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * *; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * [Emphasis added.] We have set forth the pertinent provisions of the trust in our Findings of Fact. Three of the provisions are fatal to petitioner's *165 position. First, unexpended income is to be paid to the settlors (petitioner and his wife). Second, on the termination of the trust, the remaining trust estate is to be distributed to petitioner's son. Third, the settlors (petitioner and his wife) reserved the right to alter, amend, or revoke the trust and to withdraw property therefrom. Under these circumstances, and with the additional element that the record herein is devoid of any evidence as to how the income and principal of the trust was actually utilized, we cannot determine whether the trust was "organized and operated" exclusively for the permissible purposes - both essential elements under the statute. Commissioner v. John Danz Charitable Trust, 284 F. 2d 726, (C.A. 9, 1960), affirming 32 T.C. 469 (1959). Moreover, part of the net earnings could inure to the benefit of private shareholders or individuals - also in violation of a statutory requirement. Consequently, we sustain respondent on this issue. Decisions will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩