**Joseph BECKER and Dorothea Becker, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. 15251.**

United States District Court
W. D. Pennsylvania.

April 18, 1958.

Buchanan, Ingersoll, Rodewald, Kyle & Buerger, David B. Buerger and George M. Heinitsh, Jr., Pittsburgh, Pa., for plaintiff.

James P. Garland and Jerome S. Hertz of Dept. of Justice, Washington, D. C. and U. S. Atty., D. Malcolm Anderson, Pittsburgh, Pa., for defendant.

McILVAINE, District Judge.

The plaintiffs are individuals, husband and wife, residing in Allegheny County.

They have brought this action against the United States for the recovery of $42,036.51 of income tax paid by the plaintiffs for the taxable year 1951. They duly filed with the Collector of Internal Revenue for the Twenty-third District of Pennsylvania their joint income tax return for the taxable year 1951, disclosing an income tax liability of $115,018.13.

During 1951 and for many years prior thereto, the plaintiff, Joseph Becker, was employed by Koppers Company, Inc., and its predecessors. From 1906 to 1910 he was employed by Heinrich Koppers in Germany to work as a chemist, analyzing coals in the laboratory and also checking production methods in the field. In 1910 Mr. Becker came to the United States where he was employed by Heinrich Koppers as a chemist in connection with the company's operations at Joliet, Illinois. When he first came to the United States, he continued to do essentially the same kind of work that he had been doing in Germany, and several years later he became superintendent of Koppers' operations in this country. He was employed in this capacity from 1912 to 1917. The American business of Heinrich Koppers was incorporated in 1912, and shortly thereafter, about 1914, he sold his business in the United States to American interests.

Mr. Becker continued as an employee of the company. From 1917 to 1924 he was employed as a consulting engineer for the Koppers Company. In 1924 he became assistant to the vice president, and from 1925 to 1931 he was employed as vice president and general manager of Koppers Construction Company, a subsidiary corporation. From 1931 to 1936 he was president of that subsidiary, and in 1936 he became vice president and general manager of the Engineering and Construction Division of Koppers Company, which position he occupied until his retirement in 1952. There was never a written employment contract between Becker and the company. Becker was paid a substantial and adequate salary for his services as employee. For ex-

ample, his annual salary in 1921 was $11,400; in 1928 his salary, including bonuses, was $84,000; and in 1951 his salary was $75,000.

Mr. Becker was not employed in the capacity of inventor or specifically assigned the duty of making inventions, but was employed only in a supervisory or managerial position. He devoted substantially all of his time to managing and running the operating end of Koppers Company's business.

Between 1913 and 1920 Becker made about eight minor inventions and obtained patents on them. He voluntarily assigned them to the company without asking any payment for them although he was under no duty to make such assignments. These early inventions were of no importance, had no value, and were never used.

During the summer of 1920 and sometime prior to the middle of August, Becker made a very important and significant invention. This was his crossover coking retort oven, which was his basic and dominant invention and which is commonly referred to as the "daddy" invention. The plaintiff told Mr. H. B. Rust, President of Koppers Company, that he had conceived this invention and that it was something that was important and fundamental. He told Rust that he would not be willing to assign it to the company without consideration, but that he would be willing to sell the invention. Neither Rust nor any other official of Koppers Company ever suggested that the company owned Becker's inventions or patents or even that the company had shop rights therein.

On March 1, 1921 plaintiff entered into a written agreement with Koppers Company whereby he agreed that as long as he was employed by Koppers Company he would assign all his inventions "in entirety" to the company, together with all the United States and foreign patents thereon. This agreement required Koppers Company to pay for its own use of the United States and foreign patents a sum of not less than $8,000 per year pro-

vided that the net earnings of its engineering and construction business for the year amounted to $500,000, and that Becker was still in the company's employ. With respect to any licenses which Koppers Company might grant under the foreign patents, the company agreed to pay Becker or his heirs, executors or administrators 20% of any net profits the company received for such licenses. These percentage payments under paragraph Third were payable regardless of whether Becker continued in the company's employment.

Pursuant to this agreement of March 1, 1921 the plaintiff sold and transferred a number of patented inventions to Koppers Company, including his main cross-over or "daddy" invention. All of these inventions are related in one way or another to coke ovens or the coke industry, and most of them are related to the one significant and basic invention of the plaintiff—the cross-over coking retort oven, which is covered by United States Patent No. 1,374,546 and by corresponding foreign patents in Great Britain, France, Belgium and Italy. Most of the other patented inventions were improvements on, or auxiliary to (i. e., machinery or process patents) this dominant and basic main cross-over patent. Of those patents which were not improvements to the basic patent—i. e., those that were small apparatus patents in the body of the by-products oven— most of them were of no value and none of them were of any substantial importance by themselves.

The plaintiff had completed the conception of the basic main cross-over invention and had held it for more than six months, both at the time he entered into the March 1, 1921 agreement and on March 11, 1921 when he actually assigned the invention to Koppers Company pursuant to the agreement.

In 1923 Koppers Company as owner of the foreign patents on the main cross-over invention granted to a French company an exclusive license to employ those patents in France and certain other countries in Western Europe. In 1924

Koppers Company granted to a British company a similar exclusive license covering Great Britian, Ireland, and almost all of the rest of the British Empire. In connection with Koppers Company's grants of these exclusive licenses to the British and French companies, Becker entered into two supplemental written agreements with Koppers whereby for $25 each he waived and surrendered a contingent non-exclusive license-back granted to him in paragraph Fourth of the agreement of March 1, 1921 insofar as it related to the countries covered by the exclusive licenses of the British and French companies.

Over the years Koppers Company has received substantial sums from its British and French licensees under the two exclusive license agreements mentioned above. Koppers Company has paid 20% of these amounts to Becker under paragraph Third of the March 1, 1921 agreement. All of the percentage payments made by the company to the plaintiff under paragraph Third of the agreement, including the $70,427.78 paid in 1951, were attributable to the "daddy" patent. The company also paid Becker $8,000 per year under paragraph Second of the agreement, and this is the only consideration provided for in the agreement covering Koppers Company's own use of the patented invention and improvements. During 1951, the taxable year involved in this case, Koppers Company paid to the plaintiff under the 1921 agreement the sum of $78,427.78 consisting of $70,427.78 paid under paragraph Third and $8,000 paid under paragraph Second.

Koppers Company in its own income tax returns reported the payments to Mr. Becker under paragraph Third of the agreement as a reduction in the amount of the royalties which the company received from its British and French licensees. It never withheld income tax on these payments to Mr. Becker. In the years 1945, 1946, and 1947, Koppers Company in its own income tax returns reported the $8,000 payments to Mr. Becker under paragraph Second of the

**336**

agreement as compensation. Although the company did withhold income tax on these payments during the years 1943 to 1949, it did not withhold income tax on such payments for years after 1949, including the taxable year in question. During World War II, the Salary Stabilization Unit of the Treasury Department issued a ruling to the company in which it determined that amounts paid under the 1921 agreement, including the $8,000 payments under paragraph Second of the agreement, did not constitute salary or compensation.

For many years Mr. Becker in his income tax returns reported the amounts received from Koppers Company under the 1921 agreement as ordinary income. In the joint income tax return for 1951, the $8,000 received under paragraph Second and the $70,427.78 received under paragraph Third were both reported as "royalties". The amounts paid under paragraph Third in 1949 and 1950 were reported as "royalties" for both years. The $8,000 amount paid under paragraph Second was reported as "compensation" for 1949, but was reported as "royalties" for 1950.

In 1953 and 1954 the plaintiff filed refund claims for all taxable years still open (1949, 1950, and 1951), claiming that he had erroneously reported these amounts in his joint return as ordinary income, whereas they were properly taxable as long-term capital gains. With respect to 1949 and 1950, the Commissioner of Internal Revenue agreed that the amounts received from Koppers Company under paragraph Third of the 1921 agreement were properly taxable as long-term capital gains and he granted and paid refunds to the plaintiffs. The Commissioner, however, disallowed the refund claims with respect to the amounts paid under paragraph Second of the agreement contending that they represented salary or other compensation.

Despite his action in allowing refunds for 1949 and 1950 with respect to the percentage payments under paragraph Third, the Commissioner denied the refund claim for 1951 on the ground that for years after 1950, Min. 6490, 1950-1 Cum.Bull. 9, precluded capital gains treatment of amounts received for the assignment of a patent where such amounts are measured by production, sale or use or are payable periodically over a period generally coterminous with the transferee's use of the patent.

Both the plaintiffs and defendant agree that the sole issue is whether the amounts received by the taxpayer, Joseph Becker, from his employer in 1951, pursuant to the terms of an agreement dated March 1, 1921, constituted additional compensation for services rendered, taxable as ordinary income, as contended by the Government or whether such amounts constituted payments for sale of a patent and thus made such amount taxable at capital gains rates, as contended by the taxpayers?

This Court, after hearing the testimony, and having the opportunity to observe Mr. Becker on the witness stand, and to evaluate his testimony is of the opinion that the payments received by the plaintiff, Joseph Becker, under the 1921 agreement are proceeds of the sale of his patented inventions, taxable as capital gains, and therefore, we make the following:

Conclusions of Law

1. Becker's main cross-over coke oven and other inventions did not belong to Koppers Company, Inc., upon their conception or reduction to practice either by virtue of the employer-employee relationship existing between Becker and the company or with respect to those inventions made after March 1, 1921, as a legal consequence of the execution and existence of the agreement of March 1, 1921.

2. All Becker's substantial rights in his patented inventions were sold, assigned, and transferred to Koppers Company, Inc., by the formal patent assignments which Becker executed in fulfillment of his agreement to assign patents dated March 1, 1921.

3. The payments involved in this case under Paragraphs Second and Third

of the agreement of March 1, 1921 were paid to Becker in addition to and separate and apart from any salary and wages paid to him for his services as employee. The said payments were received by Becker in consideration for his patented inventions transferred to Koppers Company, Inc., and not for services performed for the company, and are not taxable as compensation for services rendered.

4. The payments involved in this case constitute proceeds of sale of a capital asset and are taxable as long-term capital gains, both under the provisions of Section 117(q) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(q), and under the prior law as established in the decided cases, and not as ordinary income.

5. The plaintiffs are entitled to judgment against the defendant, the amount thereof to be determined in accordance with paragraph Nine of the stipulation filed pursuant to the pre-trial conference, together with interest and costs.

An appropriate Order for judgment may be submitted.