George A. Dean and Margaret S. Dean v. Commissioner.
Dean v. Comm'r
Docket No. 5692-63.
United States Tax Court
T.C. Memo 1966-258; 1966 Tax Ct. Memo LEXIS 26; 25 T.C.M. (CCH) 1321; T.C.M. (RIA) 66258; November 28, 1966
A. Glenn Sowders, Jr., 800 W. 47th St., Kansas City, Mo, for the petitioners. Hugh C. McMahon, for the respondent. FORRESTER
*26 Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined a deficiency in the income tax liability of the petitioners for 1961 in the amount of $7,383.67. The sole issue is whether $38,281.38 received by petitioner George A. Dean in that year was compensation for services or consideration for the transfer of property. The petitioners, husband and wife, resided in Shawnee Mission, Kansas, during the taxable year in issue and at the time the notice *27 of deficiency was mailed to them. Their joint Federal income tax return for 1961 was filed with the district director of internal revenue, Kansas City, Missouri. Margaret S. Dean is a party only by reason of having filed a joint return with her husband. He will hereafter be referred to as the petitioner. Some of the facts have been stipulated and are so found. The petitioner has been engaged in aeronautical engineering since 1940. From 1945 to 1948 he represented the Benson Manufacturing Company of Kansas City, Missouri, (hereafter referred to as BMC), in aircraft sales. In 1948 petitioner and members of the Benson family formed a partnership, Product Promotion and Development Company, (hereafter referred to as PPD), with offices in New York City to carry on the business previously conducted by petitioner as a sole proprietor. PPD acted as the exclusive sales and engineering representative for BMC for all of the United States east of the Mississippi River. Petitioner was managing partner and engaged in sales activity. The partnership was dissolved in November of 1959. In 1951 or 1952 Dean & Benson Research, Inc., (hereafter referred to as DBR), was incorporated to carry on research *28 activities that had been conducted up to that time by PPD. The principal stockholders were petitioner and members of the Benson family. Petitioner owned approximately one-sixth of the stock and was president of the company. DBR received commissions and engineering fees from BMC. DBR had its offices in Clifton, New Jersey, and the petitioner lived nearby. At the time of trial petitioner had had some 15 patents issued to him, 5 of which are relevant to this case. They are: No. 2436087 "Cooling Fan for Aircraft Engines" No. 2595829 "Axial Flow Fan And Compressor" No. 2718153 "Drive Mechanism" No. 2648454 "Knock Down Streamline Container" No. 2582532 "Electric Fans" These patents will hereafter be referred to as patents one through five, the numbers referring to the order in which the patents are listed above. Patent number one was issued to Ernest H. Benson in 1948, and in that same year he assigned his entire right, title and interest in the patent to petitioner. Petitioner at the same time granted to BMC "the exclusive right and license to manufacture and sell cooling fans disclosed and claimed in said Letters Patent * * * throughout the entire United States and its *29 territories, and to extend to purchasers of said fans the right to use them * * *." BMC agreed to pay a royalty, one-sixth of which was to go to petitioner and the remaining five-sixths to members of the Benson family. The license was irrevocable by petitioner. BMC produced under this patent, and royalties were paid to the petitioner. Petitioner entered into the royalty arrangement in order to secure production under the patent by BMC. By an instrument dated April 28, 1952, petitioner, who at that time held applications for what were to become patents number two and four, granted to BMC "the sole and exclusive right and license to manufacture, use, sell and otherwise practice the Licensed Inventions * * * throughout the territories covered by the Licensed Patents; together with the right to extend sublicenses and to extend to purchasers of the Licensed Inventions the right to use same." "Licensed Patents" referred to any patents that might issue from the applications. "Licensed Inventions" referred to the inventions covered by the applications. BMC agreed to pay a royalty, one-sixth of which was to go to the petitioner and the remaining five-sixths to the same persons entitled to *30 receive royalties under the license agreement covering patent number one. The license was irrevocable by petitioner. Patent number two was issued May 6, 1952. Patent number four was issued August 11, 1952. At the time of trial there had been no production under patent number four. There had been production under patent number two, and royalties had been paid to the petitioner. Patents number three and five were granted to petitioner in September of 1952 and on January 15, 1952, respectively. There had been no production under either patent at the time of trial, and no licenses had been granted. In 1959 BMC was contemplating a public offering of its stock, which took place in 1960. To enhance the projected public offering and for other reasons BMC desired to establish an engineering and development division of its business, which it had not previously had. In the spring of 1959, BMC opened negotiations with the petitioner which culminated in the following contract, executed November 6, 1959: November 6th, 1959 Mr. George A. Dean Kansas City, Missouri
Dear Mr. Dean: We have agreed that your compensation for services to The Benson Manufacturing Company should in part be *31 based upon the Company's sales of certain products hereinafter called "Bonus Products". This letter outlines your basic compensation to be received for services and the additional compensation to be paid to you to be based upon the Company's sales of such products. Commencing August 3rd, 1959, the Company will pay you a fixed salary at the rate of $15,000 per annum plus additional compensation as follows: (i) One per cent (1%), but not to exceed $10,000 per annum of the Company's net sales of Bonus Products commencing with the Company's 1959 fiscal year; plus (ii) Two per cent (2%), but not to exceed $20,000 per annum, of the Company's net sales of Bonus Products, commencing with the Company's 1960 fiscal year. The additional compensation will be determined with respect to each fiscal year and paid to you in cash within 60 days after the close of such fiscal year. You shall have 30 days after receipt of such payment in which to make a claim in writing for an additional amount of such compensation if you disagree with our calculation of such additional compensation, but, if not so made, any such claim shall be deemed to have been waived. This schedule will govern your compensation *32 for the period from August 3rd, 1959 until December 31, 1963, so long as you are employed by the Company. In the event of the termination of your employment, you shall receive the amount of fixed salary accrued to the date of termination and, at the close of the fiscal year in which such termination shall occur, the additional compensation will be determined in the same manner as if your employment had continued for the entire year, but only the part of such additional compensation proportionate to the number of days of your employment by the Company during such year shall be paid to you; provided, however, that in the event of the termination of your employment by death or by discharge by the Company, that part of the additional compensation, if any, payable under (ii) above shall be paid to you, or to your personal representative, in case of your death, in the same manner as if your employment had continued until December 31, 1963. The term "Bonus Products" shall be limited to those products described on the schedule attached hereto plus those products, if any, to be described on additional schedules to be attached hereto from time to time, which are approved in writing by you *33 and by the Company. You acknowledge that all inventions, improvements, patentable ideas, methods, processes and devices; relating to or usable in or about the manufacture of any products manufactured by Dean & Benson Research, Inc., or the Company, formerly, now, or hereafter, or for the doing of work upon which you have been, are now, or may be employed, which have been or shall be made, discovered, invested, designed, developed or improved in whole or in part by you during the course of your employment, belong to and are the sole and exclusive property of the Company, its successors and assigns; shall be by you disclosed to the Company; and all patents and applications for patents on such inventions or improvements shall on request of the Company be assigned to it or its assigns in such form as may be reasonably requested, and this instrument shall be deemed an assignment thereof. Without limiting the generality of the foregoing, you hereby assign, transfer and set over to the Companyall your right, title, and interest in and to the following U.S. Letters Patent, together with all royalty rights in connection therewith: No. 2436087 "Cooling Fan for Aircraft Engines" No. 2595829 *34 "Axial Flow Fan And Compressor" No. 2718153 "Drive Mechanism" No. 2648454 "Knock Down Streamline Container" No. 2582532 "Electric Fans" If the foregoing is satisfactory, please indicate your acceptance on the enclosed copy of this letter. Very truly yours, THE BENSON MANUFACTURING COMPANY
By /s/ A. J. Benson President Accepted and Approved: /s/ George A. Dean BONUS PRODUCTS Blowers for military and commercial uses Heat exchangers Oil coolers Cryogenic products The listed bonus products were products that had been developed by DBR. On May 31, 1961, the parties executed an amended contract. It substituted the following paragraph for the second paragraph of the original contract: Commencing January 1, 1960, the Company will pay you a fixed salary at the rate of $15,000 per annum, plus additional compensation as follows: (I) One per cent (1%), but not to exceed $2,500 per annum of the Company's net sales of Bonus Products, commencing with the Company's 1960 fiscal year; plus (II) Two per cent (2%), but not to exceed $20,000 per annum of the Company's net sales of Bonus Products, commencing with the Company's 1960 fiscal year. The amended contract *35 did not list bonus products. It stated: The term "Bonus Product" shall be limited to those products which had been developed by the former Dean & Benson Co. and those products developed by you during the course of your employment by Benson Manufacturing Company. This category may also include additional products which may from time to time be mutually agreed upon by any and The Benson Manufacturing Company and so stipulated by written approval of both parties. In all other respects the amended contract was identical to the original. The original document as amended will hereinafter be referred to as the contract. The subparagraphs of the second paragraph will be referred to as parts (i) and (ii) of the contract. The shareholders of DBR contributed their stock to BMC in 1959 and DBR was liquidated into BMC. The facilities of DBR were transferred from Clifton, New Jersey, to Kansas City, Missouri, and integrated into the operations of BMC. Petitioner became an employee of BMC. During the taxable year 1961 petitioner received $15,000 from BMC which was reported on his Federal income tax return as wages and is not in dispute herein. During the taxable year 1961 petitioner also *36 received from BMC the sum of $38,281.38, which is in dispute herein. Such amount was paid under parts (i) and (ii) of the contract. It was attributable to both 1960 and 1961, although paid in 1961. The parties have stipulated that $4,375 of the disputed sum was paid under part (i) of the contract and the remaining $33,906.38 was paid under part (ii). On its books and records for the year 1961 BMC treated all payments to petitioner as either salary or commissions. The petition alleged that petitioner received $38,281.38 in 1961 "in partial payment for transfer of all substantial rights to these patents, [patents one through five] and duly reported this sum as long-term capital gain." At trial petitioner sought to prove that the amount in dispute was received as consideration for his transfer to BMC of his interest in patents one through five, his stock in DBR and his interest in the PPD partnership. Respondent's position is that the disputed amount represents compensation for services and is therefore taxable as ordinary income. Petitioner testified that he sold his interest in the PPD partnership to BMC and that the payments to him under the contract were in part consideration *37 for such transfer. Petitioner at other times characterized the payments under the contract as being in part for the dissolution of the partnership. Aside from petitioner's own fragmentary testimony there is no evidence in the record that there was ever any sale by the petitioner of his interest in PPD to anyone, to say nothing of evidence that payments under the contract were in consideration of such a sale to BMC. Even if we were persuaded that there had been a sale by petitioner of his interest in PPD to BMC there is insufficient evidence in the record from which to make a finding of the value of such interest. The only evidence from which it might be inferred that an interest in the partnership had any value is the following statement in the prospectus, dated January 18, 1960, to accompany the public offering of BMC stock: Product Promotion and Development Company, a partnership composed of members of the families of the officers of the Company and others, has acted as a sales agent for certain products of the Company and received commissions and service fees of $65,155.40 in 1956, $103,155.29 in 1957 and $47,065.37 in 1958. This partnership no longer performs such services *38 for the Company and no payments have been made in 1959. Dean & Benson owed Product Promotion and Development Company $27,363.52 for advances made to it, which obligation was assumed by the Company in the liquidation of Dean & Benson. This amount will be paid to this partnership and it will then be dissolved. Petitioner's counsel never mentioned at trial or on brief section 741 of the Internal Revenue Code of 1954, on which his argument with respect to the alleged sale of the partnership interest must rest. It is therefore not surprising that the record contains no evidence to suggest how much of whatever might have been received in such alleged sale was attributable to unrealized receivables of the partnership or inventory items of the partnership which had appreciated substantially in value. See section 751 of the 1954 Code. On balance we conclude that petitioner has failed to carry his burden of proving that any payments under the contract were in consideration of a transfer by him to BMC of an interest in the PPD partnership. Petitioner also contends that part of the payments under the contract were in consideration of the transfer by him to BMC of his *39 stock in DBR. We have concluded that petitioner did, indeed, transfer his stock in DBR to BMC. The problem with petitioner's argument is that the evidence does not support his position that payments under the contract were in part payment for such transfer. There is evidence in the record that the stock was worthless at the time the contract was executed. Petitioner claimed a long-term capital loss deduction in the amount of $14,846 on his return for 1961 on the theory that his DBR stock had become totally worthless, apparently in 1959, and that he was entitled to a capital loss carryover to 1961. The BMC prospectus describes the acquisition of DBR stock and the liquidation of the company as follows: Dean & Benson Research, Inc. was acquired on May 29, 1959, by contribution of stock by the stockholders of that Company. The operations of Dean & Benson Research, Inc., formerly conducted in a plant located at Clifton, New Jersey, were terminated on July 17, 1959 and the Company began the process of liquidation at that date. The unliquidated assets at August 31, 1959, including all rights to various products developed by Dean & Benson Manufacturing Company in exchange for assumption *40 of the remaining liabilities and an open account to Benson. The amount of the liabilities assumed exceeded the fair value of the tangible assets, as follows: Liabilities assumed: Current liabilities
$ 33,314
Open account to The Benson
Manufacturing Company
201,614
$234,928
Less fair value of tangible assets: Land and building
$80,000
Equipment
70,360
Other
12,740
163,100
$ 71,828
It does appear that BMC desired to acquire the facilities of DBR in order to be able to represent that it had a research division and thereby to enhance the public offering of its stock. The inducement to petitioner to transfer his shares does not, however, appear to have been by way of payment for them. Rather, it appears that the inducement was to make his compensation as an employee of BMC turn, in part, on the sale of bonus products, which included products that had previously been produced by DBR and products developed by the petitioner as an employee of BMC. Petitioner apparently sought a lump-sum payment for his stock in DBR. However, there seems to have been some question at the time of the contract whether the DBR products would add to BMC's profitability. *41 In light of the precarious financial situation of DBR the directors of BMC apparently decided that rather than pay the petitioner anything for his DBR stock, that his compensation under the contract should be geared, in part, to the sales of DBR products. There is testimony in the record that petitioner was hired "to push these products," and that description of the transaction is supported by the language of the contract. Considering both the evidence of worthlessness of the DBR stock and the contract provisions relating payment to sales of bonus products, we have concluded that petitioner has failed to prove that any payments under the contract were in consideration of the transfer by him to BMC of his stock in DBR. Rather, we have concluded that petitioner transferred his stock to BMC as part of an arrangement by which BMC agreed to hire him and to make his compensation dependent in part upon sales of products previously developed, produced and sold by DBR and products to be invented or developed by petitioner as an employee of BMC. Cf. Arthur N. Blum, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950), and Roland Chilton, 40 T.C. 552 (1963). *42 Finally, petitioner contends that some part of the payments made under the contract were in consideration of the transfer by him to BMC of his interest in patents one through five. The contract refers to past and future patents and states that "this instrument shall be deemed an assignment thereof." It adds: "Without limiting the generality of the foregoing, you hereby assign, transfer and set over to the Company all your right, title, and interest in and to the following U.S. Letters Patent, together with any royalty rights in connection therewith: [patents one through five are then listed]." There is testimony in the record to suggest that patent number three had some value and that BMC had an interest in terminating its obligation to pay royalties under the license agreements covering patents one, two and four. However, we are not persuaded that payments under the contract were related to the value of the patents or to an estimation of future royalties under the licensing agreements. Rather, we have concluded that petitioner transferred his rights in the patents and under the license agreements in return for a generous employment contract. None of petitioner's evidence can *43 overcome the basic presumption that payments under the contract were, in varying degrees, contingent upon his rendering service to the company. Payments under part (i) were wholly contingent on petitioner's remaining an employee of BMC. Payments under part (ii) were to continue in the event of his death or discharge by the company before the expiration of the term of the contract, but such payments under part (ii) would have ceased altogether in the event that petitioner voluntarily left the company's employ. The fact that payments under parts (i) and (ii) were geared to the sale of bonus products also militates strongly against relating payments thereunder to the transfer of patents or royalty rights since there was no correlation between bonus products and the patents. This is not a case where payment for patents is related to sales of products incorporating the invention. Finally, the record title to patents one, three, four and five remained in petitioner's name at the time of trial. Record title to patent number two was transferred to BMC only after petitioner executed an instrument dated October 4, 1961, wherein he purported to assign his entire right, title and interest *44 in patent number two to BMC. We recognize that the form of a written agreement does not necessarily dictate the substance of the transaction. We are also aware that it was in the interest of BMC to treat all payments under the contract as compensation to petitioner, which it did on its books and records. Nevertheless where contract language allocates payments in a particular manner strong proof must be adduced to overcome that declaration. Cf. Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). The petitioner in the instant case had been associated with BMC in the areas of engineering and sales for about 14 years prior to 1959. The negotiations that led to the contract continued over about six months. Petitioner testified that widely varying proposals were discussed during this period. His account of the negotiations shows him to have been sophisticated in business dealings and aware of the particular value of his services to BMC. That he may not have been aware of the tax consequences of the terms of the agreement does not change the fact that he voluntarily agreed to such terms. Where parties enter into an agreement *45 with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. See Hamlin's Trust v. Commissioner, 209 F. 2d 761, 765 (C.A. 10, 1954), affirming 19 T.C. 718 (1953). Petitioner has failed to carry his burden of proving that payments under the contract were not compensation for services as determined by the statutory deficiency notice. Decision will be entered for the respondent.