CHANNING W. GILSON AND MARIE K. GILSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gilson v. Commissioner
Docket No. 3801-78.
United States Tax Court
T.C. Memo 1984-447; 1984 Tax Ct. Memo LEXIS 228; 48 T.C.M. (CCH) 922; T.C.M. (RIA) 84447; August 21, 1984. *228 P, a professional inventor of industrial designs, entered into 82 separate design contracts with 53 different clients during the years 1977 through 1974. P created unique patentable designs for his clients and was paid flat fees for those designs. Held, P's design contracts transferred to his clients all substantial rights to patents within the meaning of sec. 1235(a), I.R.C. 1954. Held further, since P was an independent contractor, not an employee, the "hired to invent" rule does not apply. Downs v. Commissioner,49 T.C. 533 (1968), and Blum v. Commissioner,11 T.C. 101 (1948), affd. 183 F. 2d 281 (3d Cir. 1950), distinguished. Held further, on the facts of this case, the payments P received from his clients were consideration for the transfer of his rights in his patentable designs, not compensation for his services, so the payments qualify for capital gains treatment under sec. 1235, I.R.C. 1954. Craig C. Alexander and Robert M. Barton, for the petitioners. Charles O. Cobb, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined the following deficiencies in petitioners' Federal income taxes: Year
Amount
1971
$8,417
1972
4,505
1973
9,244
1974
9,411
The *229 sole issue is whether payments that petitioner Channing W. Gilson received during the years in issue constituted compensation for services, taxable as ordinary income, or payments for all substantial rights to patents, qualifying for capital gains treatment under section 1235. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Channing W. Gilson and Marie K. Gilson, [2] husband and wife, resided in Los Angeles, California at all times relevant to this case. Petitioners, cash-basis taxpayers, filed joint Federal income tax returns for their calendar years 1971, 1972, 1973, and 1974 with the Internal Revenue Service Center at Fresno, California. Since 1951, petitioner Channing W. Gilson (hereinafter petitioner) has been a professional inventor of industrial designs, designing the external surfaces of manufactured articles so *230 that these articles are both aesthetically pleasing and easier to use. Petitioner has won numerous awards for the excellence of his industrial designs. During the years in issue, petitioner conducted his business as a sole proprietor under the name "Channing Wallace Gilson, Industrial Design." During these years, petitioner had a few large clients such as Hughes Aircraft, North American Rockwell, and Bell & Howell and many clients that were smaller manufacturing companies. During the years in issue, petitioner had 82 contracts with 53 different clients. Petitioner was an independent contractor and not an employee of any of his clients. Typically, [3] *232 a potential client would contact petitioner proposing that petitioner undertake the industrial design of a new product the client had developed and hoped to manufacture and market. Next, petitioner would meet with the client's management and engineering personnel at the client's plant or office to be shown the client's new development or research work and to discuss with the client its product design requirements. Petitioner was never retained to make drawings of a design the client had already created but was always retained to create *231 a new and original design. Petitioner would then return to his office and draw up a letter outlining the steps involved in completing an industrial design and proposing a flat fee or price for the design. [4] *233 Petitioner set his fees or prices on the basis of a number of factors, including the difficulty involved in completing the design, the budget of the client (if known to petitioner), petitioner's knowledge of the customer's size and ability to pay, and, occasionally, petitioner's estimate of possible bids by his competitors. Prior to the years in issue, petitioner had charged his clients by the hour. However, the abandoned that practice because he found that his customers were not interested in the number of hours he expended and instead wanted a design for a flat fee. Typically, a client would accept petitioner's proposal through a form purchase order or form contract the client had prepared. Some of the form purchase orders or form contracts described petitioner's contractual obligation as "industrial design work," "industrial design services," "consulting services," or similar terms suggesting performance of services. Other contracts referred to "Industrial Design," "Cost of Design," or similar terms suggesting the sale of designs. Some of the contracts also reproduced part of petitioner's proposal letter. A few of petitioner's design contracts during these years were oral. Following the acceptance of his proposal, petitioner would carefully research the appearance of products manufactured by the client's competitors. Petitioner maintained an extensive library of catalogs, professional and trade magazines, directories, and advertising materials regarding products and product *234 designs that he used to ascertain competing products and prior art. Petitioner's clients also furnished him with data about their competitors' products. Petitioner would also research possible materials for use in the finished product. After completing his research, petitioner would prepare rough sketches of two or three different design proposals and would present the drawings at a matting with the client's engineering, management, and sales personnel. The client's representatives would screen the proposals and usually discard one or more of the proposed designs. Following this meeting, petitioner would return to his office and prepare a more detailed design proposal. Petitioner would then take the drawings of his revised proposal to another meeting with his client's representatives. The number of meetings and proposed revisions varied from client to client. These meetings with the clients, however, represented only a small part of the time required to create the design. Eventually, petitioner would prepare and present to the client the final, detailed design drawings from which the client's engineers could make production drawings. Petitioner would usually receive his fee *235 in installments as he presented design drawings to the client. Petitioner would receive the final installment upon his competition of the project by delivery of the final design drawings to the client. Petitioner was not required to account to his clients for the time he spent on a design. The industrial designs petitioner created for his clients were unique, innovative, attractive, and functional, and were quote different from the designs of his clients' competitors. Petitioner had many satisfied clients who returned to him for additional projects. Generally, petitioner's clients were very pleased with his designs. [5] *236 Each of the designs represented petitioner's own creative effort; the designers petitioner employed merely made more detailed drawings of the designs petitioner himself conceived. Many of the articles or products for which petitioner created designs were never produced or marketed by the clients for various business reasons unrelated to the quality of petitioner's designs. Designs like those created by petitioner in this case may be patented if they are new, original, and ornamental. Determination of this question involves examination of existing design patents and of unpatented prior are more than one year old. A patent attorney advising a client on patentability would normally examine (or have an agent examine) the records of issued patents at the U.S. Patent & Trademark Office (Patent Office). Because of some uncertainty over prior art, event with a search at the Patent Office, a patent attorney would always hedge or qualify his advice to his client concerning the patentability of a design. The only way to be absolutely certain that a design is patentable is to submit a patent application and await acceptance or rejection. However, the patent attorney could examine prior art in many way--he could examine (or have an agent examine) a library of various catalogs, professional and trade magazines, *237 directories, and advertising materials at the Patent Office, or his own library of such materials, or rely upon the inventor-client's examination of the client's own library of such prior art reference materials. If a patent attorney or his inventor-client had an adequate library covering prior art, the attorney might qualifiedly advise that a design was patentable without a formal search at the Patent Office. A highly qualified professional inventor of industrial designs with over 30 years' experience in the field, such as petitioner, could reasonably search prior art as petitioner did in this case. Many owners of patentable designs will make a business decision not to patent their designs, for various reasons. Between 1955 and 1978, petitioner had been issued 21 design patents, all of which he assigned. One of them was the design patent for a smoke detector that petitioner created under one of the contracts involved in this case; that smoke detector was manufactured and marketed. Petitioner has never had an application for a design patent denied. None of petitioner's designs under the contracts here in issue have ever been claimed to have infringed any patented design belonging *238 to someone else. During the years in issue, petitioner's proposal letters to prospective clients generally contained the following paragraph or a similar paragraph: We wil cooperate fully in assigning design rights to you in consideration of full remuneration from you, whether patented or not, however, this is to be done at your expense. Petitioner and each of his clients understood this language to clarify that petitioner was transferring to the client all rights to the design, including the right to apply for a design patent, but that it was up to the client to pursue a patent at its own expense. Petitioner generally would represent to each client that his design would be unique and patentable. Generally, petitioner's clients considered the patentability of the designs as an important and valuable aspect of their contracts with petitioner. Many clients would not have contracted with petitioner had he not relinquished his rights to patent his designs. The clients wanted the right to obtain the design patent because such right could become quite important in the event of business success in manufacturing and marketing the article or product. Petitioner's clients relied upon petitioner *239 to create new and unique designs that did not imitate competitors' designs. Out of the 82 design contracts during the years in issue, only one or two of petitioner's designs were ultimately patented. Petitioner's clients generally declined to seek patents for petitioner's designs for various business reasons unrelated to the designs themselves. These business reasons included a decision not to place the product or article into production because of the expense of tooling up for production or because of some engineering defect in the article itself, a business judgment that the small market for the product did not justify the cost, a business judgment that the minimal protection afforded by the design patent would not outweigh the cost of obtaining the patent, or a business judgment that a product's useful commercial life would be exhausted before a patent could be obtained. [6]
During the years in issue, petitioner received the following amounts of fees from these 82 design contracts: Year
Amount
1971
$59,088
1972
39,319
1973
40,813
1974
42,158
On the Schedule D of the joint returns he filed with Mrs. *240 Gilson for 1971 through 1974, petitioner reported these fees as long-term capital gains under section 1235. Petitioner reported his expenses in connection with his business as a professional inventor of industrial designs on separate Schedules C. In his statutory notice of deficiency, respondent determined that these fees represented compensation for services taxable as ordinary income under section 61(a)(1) and constituted self-employment income under section 1402. [7]
ULTIMATE FINDINGS OF FACT 1. Petitioner's designs were patentable. 2. Petitioner's contracts transferred to his clients all substantial rights to his designs. 3. The payments petitioner received from his clients were in consideration for petitioner's transfer of his designs, not for the performance of personal services. OPINION *241 Section 1235[8] *242 provides that a transfer of property consisting of all substantial rights to a patent by the person who created the property is treated as a sale or exchange of a capital asset, resulting in long-term capital gains treatment. Petitioner argues that the amounts he received under his 82 design contracts during 1971 through 1974 qualified for the special capital gains rule of section 1235. Respondent contends that the payments were merely compensation for petitioner's services, taxable as ordinary income under section 61(a)(1). [9] It is clear that petitioner's various contracts transferred whatever rights he possessed in the various designs. We do not accept respondent's *243 argument that petitioner has not transferred all substantial rights to patents within the meaning of section 1235. It is largely irrelevant that out of the 82 separate contracts, only one or two of petitioner's designs were actually patented. Section 1235 does not require that a patent exist at the time of the transfer, nor even that a patent application be filed. Sec. 1.1235-2(a), Income Tax Regs.; [10] *244 Philbrick v. Commissioner,27 T.C. 346, 355-356 (1956). [11] For a transfer to come within section 1235, it is sufficient that the taxpayer transfer all substantial rights to a patentable product (e.g., design or invention). See Burde v. Commissioner,352 F. 2d 995, 998, n. 4 (2d Cir. 1965), affg. 43 T.C. 252 (1964), cert. denied 383 U.S. 966 (1966); Ofria v. Commissioner,77 T.C. 524, 539 (1981). See also Glen O'Brien Partition Co. v. Commissioner,70 T.C. 492, 500 (1978); Estate of Laurent v. Commissioner,34 T.C. 385, 399 (1960). [12] Although respondent seems to argue that petitioner's designs were not patentable, the record shows and the Court has found as a fact that they were. A patentable design must be new, original, and ornamental. 35 U.S.C. § 171 (1982). Petitioner's clients relied upon petitioner to create designs *245 that did not imitate their competitors' products. Petitioner used his extensive library of reference materials to ascertain prior art, ensuring that his designs were different from those of his clients' competitors. Petitioner's expert witness, an experienced patent attorney, testified that petitioner's library was more than sufficient to perform an adequate examination of prior art to ensure that petitioner's designs were new and original. moreover, on the facts of this case, involving design patents rather than utility (process or mechanical) patents, we are satisfied that the fact that petitioner did not search records of the Patent Office to discover existing design patents does not preclude our finding of patentability. A design patent, as opposed to a utility patent involves the appearance of a product, not its function or inner workings. Patented designs incorporated in marketed products would appear in catalogs, trade and professional magazines, directories, and other advertising materials such as those in petitioner's library. By the same token, a design not incorporated in a marketed product would be unlikely to have been patented. Thus, petitioner's research of his library *246 to ascertain prior art and competing designs would also turn up virtually all patented designs. Nor do we think that petitioner's clients' nearly uniform choice not to obtain design patents indicates a lack of patentability. His clients' decisions represented their business judgments based on many factors--the fact that few of the articles were actually manufactured, the short commercial life of many of the articles that were produced, the minimal and uncertain protection afforded by design patents, and the length of time necessary to obtain a patent. These business decisions were wholly unrelated to the quality of petitioner's designs or their patentability. Respondent's implicit definition of patentability would require at least a patent application in every case, if not actual issuance of a patent. This is not the law. It is undisputed that petitioner's designs were unique, extremely attractive, and innovative. It is also notable that petitioner has never been refused a design patent and that none of his designs under the contracts here in issue has ever given rise to a claim of infringement upon another's design patent. Based on all of the facts in this case, we are convinced *247 that petitioner's designs were patentable. See generally, 1 Rosenberg, Patent Law Fundamentals, § 6.01[5] (rev. 2d ed. 1983). Respondent's main argument is that petitioner was merely "hired to invent" the various designs. Respondent cites Downs v. Commissioner,49 T.C. 533 (1968); Chilton v. Commissioner,40 T.C. 552 (1963), and Blum v. Commissioner,11 T.C. 101 (1948), affd. 183 F. 2d 281 (3d Cir. 1950), which hold that where an employer hires an employee specifically to invent a particular product, the payments the employee receives from his employer merely constitute compensation for the employee's services. This "hired to invent" rule is drawn from substantive patent law rules involving the respective rights of employer and employee to patentable inventions. See United States v. Dubilier Condenser Corp.,289 U.S. 178, 187 (1933); Standard Parts Co. v. Peck,264 U.S. 52 (1924); Marshall v. Colgate-Palmolive-Peet Co.,175 F. 2d 215 (3d Cir. 1949); Dinwiddie v. St. Louis & O'Fallon Coal Co.,64 F. 2d 303 (4th Cir. 1933). The consequence of finding that an employee is "hired to invent" is that the patent rights to the invention belong to the employer, so that the employee has no *248 patent rights to transfer for tax purposes, [13] and the payments merely represent compensation for the services he has contracted to perform. See Downs v. Commissioner,supra,49 T.C. at 537-538; Blum v. Commissioner,supra,11 T.C. at 108-110. This rule that an employer is the equitable owner of the invention his employee has been specifically engaged to produce depends on the existence of an employment relationship. [14] *250 The rule does not apply outside of an employment relationship, so that an independent contractor, although specifically engaged to create a design or invention, is still the owner of the design or invention and the patent rights. Allegheny Steel & Brass Corp. v. Elting,141 F. 2d 148, 149 (7th Cir. 1944); *249 American Sign and Indicator Corp. v. Schulenburg,167 F. Supp. 20, 30 (E.D. Ill. 1958). Petitioner was not an employee of any of his clients but was a self-employed independent contractor. Accordingly, petitioner did not lose his patent rights in his designs simply because he contracted with his clients to create those designs. These rules are common law rules that apply in the absence of an agreement between the parties. Wehther the relationship is that of employer and employee or principal and independent contractor, a contract calling for the assignment of inventions created during the term of the contract is generally enforceable. See 1 Rosenberg, Patent Law Fundamentals, § 11.04 (rev. 2d ed. 1983). However, the taxpayer's obligation from the outset to assign his inventions to the other party does not render unavailable the benefits of section 1235--it is unimportant whether the contract to assign is viewed as executory, so that no "transfer" occurs until formal assignment and payment, or whether the payment is viewed as relating back to a previous transfer of patent rights. See and compare Hofferbert v. Briggs,178 F. 2d 743, 745 (4th Cir. 1949), affg. 85 F. Supp. 941 (D. Md. 1949); Becker v. United States,161 F. Supp. 333 (W.D. Pa. 1958); McClain v. Commissioner,40 T.C. 849-850 (1963); *251 Chilton v. Commissioner,supra,40 T.C. at 561; Reid v. Commissioner,26 T.C. 622, 633 (1956); Dreymann v. Commissioner,11 T.C. 153 (1948). [15]
The determinative question is whether the payments petitioner received under his design contracts constituted consideration for his transfer of all substantial rights to his patentable designs or consideration for the performance of personal services. This is a factual question. Beausoleil v. Commissioner,66 T.C. 244, 247 (1976); Downs v. Commissioner,supra,49 T.C. at 538; McClain v. Commissioner,supra, 40 T.C. at 849. Resolving this factual issue is difficult because "an invention is merely the fruit of the inventor's labor, and . . . payment for the invention itself necessarily compensates the inventor for his services in creating the invention." Ofria v. Commissioner,supra,77 T.C. at 535.[16] We are persuaded, however, and have found as a fact, that petitioner's customers paid him for his patentable designs, not for his services.
The objective of petitioner's clients in contracting with him was to obtain designs *252 for their products. Under the terms of the design contracts, petitioner became entitled to his fees only as he produced and delivered designs. If he did not produce a design, he was not entitled to payment. [17] By contrast, a person hired for his services generally gets paid whether or not his services produce anything useful. The nature of the fees to which petitioner was entitled under the contracts also indicates that he was paid for his designs rather than for his services. Petitioner was paid a flat, negotiated fee for his designs, not an hourly wage that traditionally indicates personal services. [18] That petitioner at an earlier time charged an hourly rate is irrelevant because he did not do so during the years in issue. In fact, petitioner abandoned his practice *253 of charging hourly fees because he found that his clients were not interested in the number of hours he spent on the project and were only interested in the total price, thus indicating that the clients were interested in petitioner's designs and not in his services as such. Although petitioner may have set his proposed fees to some extent on the basis of his estimate of the time involved, he also used other factors such as the client's budget and ability to pay, and, if he suspected competitors bidding to the same client, his estimate of what those competitors had bid. Indeed, it is notable that where the contract proposals contemplated performance by petitioner in addition to creation of his designs (for a flat fee), the proposals generally specified an hourly rate for that work. See footnote 4. It is also significant that, unlike one engaged for his services, petitioner was not required to account to his clients for his time. We attach little *254 significance to the fact that some of the contracts referred to "industrial design work" or "industrial design services." Most of these contracts were form contracts supplied by petitioner's clients, the terms of which petitioner had little power to change. Also other contracts referred to "Industrial Design," "Cost of Design," or similar terms suggesting a sale of designs. More importantly, we have looked at the record as a whole to distill and determine the overall character of these transactions, and we have based our conclusions on all of the evidence, not on isolated fragments of the record. See footnote 3. We do not agree with respondent that petitioner's receipt of fixed lump sum fees rather than installment payments based on sales (e.g., royalties) requires a finding that petitioner's design fees represented personal service compensation. One of the goals of section 1235 was to eliminate the uncertainty over the tax consequences to inventors that flowed from different kinds of payments (e.g., lump sum, installments of a fixed sum, or royalties based on use). See S. Rept. No. 1622, 83rd Cong., 2d Sess. 439 (1954). Although in some circumstances lump sum fees might tend *255 to indicate compensation to employees for services, see sec. 1.1235-1(c)(2), Income Tax Regs., that fact has no bearing in this case. Since petitioner was a self-employed professional inventor of industrial designs, his livelihood depended upon his ability to generate fees. Consequently, he may well have preferred to receive fixed, certain sums upon his completion of each design rather than subjecting himself to his clients' market risks by receiving payments based upon use or sales. This seems eminently reasonable considering that a design, quite apart from its own merits, is subject to the additional vicissitudes of business life affecting the article or product itself. Petitioner's preference for flat fees was economically sound, since many of the products for which he had created designs were never produced or marketed by the clients. We likewise disagree with respondent's argument that capital gains treatment under section 1235 depends upon the stage of completion of the invention at the time the rights thereto are transferred. Such analysis confuses the existence of rights to be transferred with the attribution of payments received by the inventor either to those property *256 rights or to the inventor's services. The amount of the inventor's personal labor in creating his invention is at least the same when he arranges for its sale beforehand as when he invents it before he looks for a buyer. Indeed, where as here, the inventor knew what his customer wanted, the amount of personal labor may well be less than when an inventor struggles to create a new product and then struggles to sell it. Also with an industrial design, there must first be an article of manufacture or product that requires a design. There is no requirement that petitioner must invent both the article and its industrial design. At most, the stage of completion is but one of many factors to consider in making our factual determination. Finally, even if certain aspects of petitioner's process of creating a design, such as petitioner's consultations with his clients' engineers and sales persons, could be segregated out and identified as "personal services," such services were plainly incidental to the primary purpose of the contracts--the production and sale of industrial designs. Such incidental personal services ancillary to the transfer of the patentable designs do not disqualify petitioner's *257 contracts from capital gains treatment under section 1235. See Hooker Chemicals & Plastics Corp. v. United States,219 Ct. Cl. 161, 591 F. 2d 652, 665 (1979); Glen O'Brien Partition Co. v. Commissioner,supra,70 T.C. at 502; PPG Industries, Inc. v. Commissioner,55 T.C. 928, 1018 (1970); United States Mineral Products Corp. v. Commissioner,supra,52 T.C. at 199. [19] In conclusion, respondent's contentions that the substance of petitioner's design contracts was to obtain petitioner's personal services and that petitioner was "hired to invent" are not borne out by the contracts and the facts in this case. Underlying respondent's position seems to be a policy argument that petitioner (and others like him) should not be allowed long term capital gains treatment for income that has such a strong element of personal labor.[20] That is decision for Congress and not this Court. The present embodiment of Congressional policy *258 is clear--section 1235 provides long term capital gains treatment for the transfer of a property right attributable in large part to a taxpayer's personal skill, knowledge, and labor. While the traditional lone inventor like Edison or Bell may be an endangered species, see 1 Rosenberg, Patent Law Fundamentals, § 11.01, p. 11-1 (rev. 2d ed. 1983), it is primarily the lone inventor for whose benefit Congress intended section 1235. This section applies only to a "holder"--the person whose efforts created the property or a person who purchased the property from the inventor prior to its reduction to practice. Sec. 1235(b); sec. 1.1235-2(d), Income Tax Regs.Section 1235 substantially liberalized the capital gains rules for inventors by eliminating tax distinctions based on the manner of payment, [21] by eradicating disparate treatment of amateur and professional inventors, [22] *260 and by repealing the holding period requirement. Part of Congress' broad remedial purpose in enacting section 1235 was to "provide an incentive to inventors to contribute to the welfare of the Nation." S. Rept. No. 1622, 83d Cong., 2d Sess. 439 (1954); see H. Rept. No. 1337, 83d Cong., 2d Sess. A280 (1954). Petitioner, *259 a self-employed professional inventor, is precisely the sort of person for whom the benefits of section 1235 were intended. Petitioner's designs wer patentable and were his to transfer. Petitioner transferred them to his clients and the payments he received were in consideration of these transfers of property. Petitioner is entitled to the benefits of section 1235. Although we hold that the payments from petitioner's clients qualify for section 1235 treatment, we are somewhat troubled by part of petitioner's reporting position. Petitioner reported as capital gain the gross amounts of his clients' fees while filing separate Schedules C listing no gross receipts and claiming as deductions all of his expenses in creating his designs. Traditionally, the costs of developing a patentable product have been viewed as capital expenditures. Hart-Bartlett-Sturtevant Grain Co. v. Commissioner,12 T.C. 760, 766-768 (1949), affd. 182 F. 2d 153 (8th Cir. 1950); Claude Neon Lights, Inc. v. Commissioner,35 B.T.A. 424, 442 (1937); Canning v. Commissioner,29 B.T.A. 99, 107 (1933). Such capital costs are normally recovered by amortization of the patent *261 from its exploitation by use or license, Rollman v. Commissioner,25 T.C. 481, 494-498 (1955), revd. on another issue, 244 F. 2d 634 (4the Cir. 1957); Claude Neon Lights, Inc. v. Commissioner,supra, or as basis recovery upon sale or other taxable disposition of the patent. Winchester, Administratrix v. Commissioner,27 B.T.A. 798 (1933); Adams v. Commissioner,23 B.T.A. 71 (1931), affd. 65 F. 2d 262 (5th Cir. 1933), cert. denied 290 U.S. 660 (1933). We rather doubt that Congress intended any change in these rules by its enactment of section 1235, [23] although we note that Congressdid change the law by enacting at the same time section 174, which permits a taxpayer to elect to expense certain research and development costs incurred in his trade or business rather than capitalizing such costs and recovering them through depreciation. See Koons v. Commissioner,35 T.C. 1092 (1961). It is likely that at least some of the expenses that petitioner *262 deducted on his Schedule C against ordinary income actually represent his basis in the designs. The record is not sufficient to make any such determination, for in addition to the possible applicability of section 174, there may well be timing questions involving costs petitioner incurred (and deducted) in one year on designs for which he received some or all of his payments in a later year. Compare the Cohan-type allocation made in Glen O'Brien Partition Co. v. Commissioner,supra,70 T.C. at 506. Respondent has not questioned petitioner's treatment of his design costs at any point in these proceedings--not in the statutory notice, not at trial, and not on brief. Indeed, the parties stipulated that the only legal issue was "the applicability of section 1235 . . . to petitioner['s] . . . business receipts . . . ." Accordingly, we decline to consider whether any of petitioner's design costs should be recharacterized as basis rather than ordinary deductions. Accordingly, to reflect the foregoing and adjustments in the statutory notice previously agreed upon by petitioners, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Uniternal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
2. Mrs. Gilson's earnings from her employment as a teacher are not in issue.↩
3. The parties were unable to agree upon sample or representative contracts from among the 82 contracts for this four-year period, but neither petitioner nor respondent has presented his case or argument on a contract-by contract basis. Instead, both petitioner and respondent have sought to characterize the tax consequences to petitioner of these contracts on an all-or-nothing basis (all ordinary income or all capital gains), based on petitioner's general, typical practices as gleaned from the numerous contracts in evidence and from the testimony or representatives of 12 of petitioner's clients. We have followed the parties' presentation of the case and made our findings accordingly. While respondent keyed his requested findings of fact to the specific contracts as to which the 12 clients testified, respondent tended to be rather selective in the portions of each witness' testimony that he relied upon the to ignore those portions that were inconsistent with his theory. Some of the factual issues in this case are close, and there are factors pointing in both directions. The Court as the finder of fact has considered and weighed all of the evidence in the record and has distilled its findings from the record as a whole. 4. In a few instances, petitioner's clients asked him to break his flat fee down into an hourly rate in order for the client to justify the budget for the design to its company management. Several of petitioner's proposals called for additional fees for additional design drafts, additional meetings, and for some models and mark-ups; these proposals did not mention hourly rates. Others specified hourly fees for certain services that the clients might desire over and above petitioner's creation of a final design for a flat fee. Despite some variations, we conclude that essentially petitioner proposed and the client wanted a flat fee for each design.
5. In one instance, petitioner had produced several proposed designs that a particular client deemed unacceptable. The client, whom the Court observed to be a rather irascible individual, cancelled the contract, denying petitioner any opportunity to complete an acceptable final design. Subsequently, petitioner successfully sued that client and recovered the value of the portion of the contract completed at the time the client abrogated the contract.
6. It often takes years for the U.S. Patent & Trademark Office to approve a patent application.↩
7. The statutory notice also contained automatic adjustments to petitioners' medical expense deductions and various other adjustments agreed to by petitioners. Respondent appears to concede the self-employment tax issue if we find section 1235↩ applicable to petitioner's design fees, and, as will be discussed below, respondent raises no issue as to petitioner's treatment of the Schedule C expenses.
8. As in effect during the years in issue, section 1235 provided, in pertinent part, as follows: SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General.--A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are-- (1) payable periodically over a period generally conterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. (b) "Holder" Defined.--For purposes of this section, the term "holder" means-- (1) any individual whose efforts created such property, or (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither-- (A) the employer of such creator, nor (B) related to such creator (within the meaning of subsection (d)). Respondent appears to concede that petitioner is a "holder" within the meaning of subsection (b)(1). ↩
9. As in effect during the years in issue, section 61 provided, in pertinent part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * *↩
10. Section 1.1235-2(a), Income Tax Regs., provides in pertinent part, as follows: (a) Patent. The term "patent" means a patent granted under the provisions of title 35 of the United States Code, or any foreign patent granting rights generally similar to those under a United States patent. It is not necessary that the patent or patent application for the invention be in existence if the requirements of section 1235↩ are otherwise met. [Emphasis added.] 11. See Gable v. Commissioner,T.C. Memo. 1974-312↩. 12. Although Glen O'Brien Partition Co. v. Commissioner,71 T.C. 492 (1978) and Estate of Laurent v. Commissioner,34 T.C. 385 (1960), involved the tax effect of the disposition of patent rights under the general capital gains rules rather than under section 1235, capital gains treatment under both provisions requires a transfer of all substantial rights to a patent. See section 1235(a), n. 8, supra; compare Glen O'Brien Partition Co. v. Commissioner,supra,70 T.C. at 500; United States Mineral Products Co. v. Commissioner,52 T.C. 177, 194-195 (1969); Ruge v. Commissioner,26 T.C. 138, 141-143 (1956). See generally Gable v. Commissioner,supra.↩
13. Since the employee is the inventor, the patent must be issued in his name. 35 U.S.C. § 111 (1982). However, if the employee was hired to invent, his employer may compel assignment to it of the patent. See Standard Parts Co. v. Peck,264 U.S. 52 (1924); TennesseeCopper & Chemical Corp. v. Martin,4 F. Supp. 38, 43↩ (D. N.J. 1932). Consequently, an employee hired to invent holds bare legal title to the patent without any right to possess or use the patented invention.
14. However, the "hired to invent" rule does not automatically come into play just because an employment relationship is found. Chilton v. Commissioner,40 T.C. 552, 562-563 (1963); sec. 1.1235-1(c)(2), Income Tax Regs. This rule only applies where the employee has been specifically engaged to create an invention. If an employee not specifically hired to make an invention conceives an invention during the ordinary course of his employment, the invention remains the employee's. The employer does not own the invention but is entitled at most to equitable relief known as a "shop right"--a nonexclusive, nonassignable right to use the employee's invention. See United States v. Dubilier Condenser Corp.,289 U.S. 178, 188-189 (1933); Francklyn v. Guilford Packing Co.,695 F. 2d 1158 (9th Cir. 1983). Where the employer has such a "shop right," the employee still has substantial rights to the invention and can make a transfer to the employer which comes within section 1235. Jordan v. Commissioner,27 T.C. 265, 267-268 (1956); Melin v. United States,201 Ct. Cl. 748, 478 F. 2d 1210↩ (1973).
15. See Hill v. Commissioner,T.C. Memo. 1963-211; Ost v. Commissioner,T.C. Memo. 1958-18↩.
16. See also Gable v. Commissioner,supra.↩
17. In the one instance during the years in issue when petitioner did not complete a final design for his client, it was because the client abrogated the contract, preventing petitioner from completing it. See footnote 5. Thus, contrary to respondent's argument, petitioner's successful lawsuit against that client doesnot↩ show that petitioner was entitled to payment regardless of whether he completed the designs.
18. In a few instances, petitioner broke down the flat fee into hourly elements, but this was only at his client's request and for the client's own internal management problem of justifying the price paid for the design. See footnote 4.↩
19. Although these decisions involved the general capital gains provisions, their rationale regarding services incidental to the transfer of patent rights applies equally to transfers of patent rights under section 1235. See Gable v. Commissioner,supra;↩ see also footnote 12.
20. In this case, the personal labor factor is especially strong because patentable designs (design patents) are involved rather than patentable inventions (process or mechanical patents). Section 1235↩, however, does not distinguish between design patents and process patents, and respondent has not suggested that design patents should be treated differently than process patents. In fact, in response to the Court's inquiry at the beginning of the trial, respondent's counsel conceded that design patents are to be treated the same as other patents. 21. S. Rept. No. 1622, 83d Cong., 2d Sess. 439 (1954). ↩
22. Under prior law, only amateur inventors were eligible for capital gains treatment from the sale of their patentable inventions. The inventions of professional inventors (e.g., those in the trade or business of inventing) were deemed property held for sale in the ordinary course of business, and thus not capital assets for purposes of prior capital gains rules. See H. Rept. No. 1337, 83d Cong., 2d Sess., 1279 (1954); Kronner v. United States,126 Ct. Cl. 156, 110 F. Supp. 730, 732 (1953); Reid v. Commissioner,26 T.C. 622, 631-632 (1956); Dreymann v. Commissioner,11 T.C. 153, 162 (1948); Myers v. Commissioner,6 T.C. 258, 266↩ (1946).
23. See H. Rept. No. 1337, 83d Cong. 2d Sess. 279-282 (1954). See also Burde v. Commissioner,43 T.C. 252, 261 (1964), affd. 352 F. 2d 995 (2d Cir. 1965), cert. denied 383 U.S. 966 (1966); Holcomb v. Commissioner,30 T.C. 354, 356-357↩ (1958).